## COMMONWEALTH *vs.* VERNON G. COBB.

Suffolk. May 2, 1977. — March 1, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Waiver. Error,* Whether error harmful. *Evidence,* Photograph.

Evidence at a murder trial was sufficient to warrant the denial of the defendant's motion for a directed verdict. [516]

At a murder trial, it was reversible error to admit in evidence, over the defense counsel's repeated objections, testimony that in response to questions during a custodial interrogation, the defendant replied, "What can I say?" and, "I have nothing to say," and to allow the prosecutor to comment on the testimony in the course of her final argument. [516-522]

At a criminal trial, there was no error in the admission of police "mug shot" photographs of the defendant on which any objectionable markings had been obscured. [522-523]

INDICTMENT found and returned in the Superior Court on September 24, 1975.

The case was tried before *Keating, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Joseph Sax (Eric A. Nissen* with him) for the defendant.

*Alice Richmond,* Special Assistant District Attorney, for the Commonwealth.

LIACOS, J. The defendant appeals under G.L. c. 278, §§ 33A-33G, from a conviction of murder in the second degree after a jury trial on an indictment for murder in the first degree. The defendant has filed numerous assignments of error, only three of which need be discussed in view of our determination that the judgment of conviction must be reversed, the jury verdict set aside, and a new trial ordered.

The defendant was indicted for murder in the first degree of William Petrosh, the operator of a small grocery store in Boston. On the morning of August 23, 1975, Petrosh had been working in his store and his sixteen-year old son had been working in the back room of the store. On hearing a shot and his father's scream, the son ran to the front of the store where he found his father fatally wounded. The son had not seen his father's assailant. No witnesses to the shooting were produced at trial. Only one witness, a taxicab driver, was able to supply a description of the events leading up to and immediately following the shooting.

The driver testified that he had picked up two black male passengers; one was of light complexion; the other was of dark complexion, had a "scarry" face and chipped teeth. After driving around for ten or fifteen minutes and making one stop, the passengers told the driver to proceed to the corner of Parker Street and Delle Avenue, the location of the grocery store. On arriving at the store, the dark-complexioned passenger entered the store. The driver testified that after a minute or two he heard a shot and a man's scream, and immediately thereafter the passenger ran out of the store, got into the taxicab, and ordered the driver at gunpoint to leave the area. After dropping off his passengers, the driver reported the incident to his dispatcher and was instructed to drive to a police station. At the station, the driver looked at 300 to 400 photographs but was unable to make an identification. Several days later, the driver was shown eight to ten more photographs, but was still unable to identify either of his passengers. Later that day he was shown eight more photographs and made an identification of the defendant as the dark-skinned, "scarry" faced passenger with chipped teeth who had entered the store just before the shot was heard.

Based on this identification, the police began a search for the defendant. After failing to find him at his mother's apartment, the police proceeded to the apartment of the defendant's father where the defendant was found, fully clothed, in the bathroom behind the shower curtain. The

police arrested the defendant, handcuffed him and read from their "Miranda card," see *Miranda* v. *Arizona*, 384 U.S. 436 (1966). After some discussion, which will be described fully below, the defendant was taken to a police station.

1. As a preliminary matter, we consider the defendant's assignment of error based on the trial judge's refusal to direct a verdict for the defendant at the close of all the evidence. We find no error.

The jury reasonably could have concluded that the taxicab passenger described by the driver as having a dark complexion, a "scarry" face and chipped teeth was the person who shot the decedent. The driver had an extended opportunity to view his passenger's face, and made a positive identification of that passenger based on examination of large numbers of photographs shown to him by the police in a manner that was not attacked as suggestive or unfair. The driver also identified the defendant at trial as being the passenger in question. The jury reasonably could have concluded that the defendant was the person who entered the grocery store just before the shooting and ran out of the store just after the shooting brandishing a gun. These circumstances, even without the support of other evidence which we need not recount, warranted a belief beyond reasonable doubt that the defendant had shot the decedent. See *Commonwealth* v. *Belton*, 352 Mass. 263 (1967).

2. The assignment of error that we find decisive as to the disposition of this appeal involves certain testimony as well as argument by the prosecutor regarding the discussions between the defendant and the police immediately after his arrest in his father's apartment and at the police station. As related previously, the police arrested the defendant at his father's apartment based on the taxicab driver's photographic identification. At the trial, the prosecutor called the arresting officer to the stand and inquired as to the events at the apartment. After eliciting testimony regarding the discovery of the defendant behind the shower curtain in the bathroom, the arrest and handcuffing of the defendant, and

the reading of the Miranda rights, the following colloquy took place between the prosecutor and the arresting officer: THE PROSECUTOR: "When you read him his constitutional rights did you ask him any question? THE OFFICER: "Yes." THE PROSECUTOR:"What did you ask him?" THE OFFICER: "Where is the gun?" THE PROSECUTOR: "And what did he say?" THE OFFICER: "He said, 'What can I say?'" At this point counsel for the defendant objected and moved to strike the questions and answers. The objection was overruled, the motion was denied and an exception was taken. The prosecutor then backtracked and again asked the witness if the defendant had made any statement after he had been placed under arrest. Over the renewed objections of the defendant's counsel, the arresting officer testified that the defendant had responded by saying, "I have nothing to say."

The officer then testified that the defendant was taken to the police station where he was again advised of his Miranda rights. The prosecutor asked if any questions had been directed at the defendant after he had indicated that he understood what had been read to him from the Miranda card. The defendant's counsel objected, was overruled, and took an exception. The witness answered: "We asked where was the gun and his accomplice." The prosecutor asked what was said next. After another round of objection and exception, the witness was allowed to testify that the defendant responded: "What can I say?"

The prosecutor, in her closing argument to the jury, emphasized the defendant's failure to respond to the questions of the police officers. She described the interchanges between the police and the defendant as follows: "[The arresting officer] [p]laces him under arrest, gives him the old Miranda rights. 'I have nothing to say,' says the defendant. Well, that, of course, is his constitutional right. . . . They book him and give him his Miranda rights again. And at that point he is asked, 'Where is the gun? Tell us who your accomplice was.' And he says, 'What can I say? What can I say?'"

Commonwealth *v.* Cobb.

We note at the outset that the statements attributed to the defendant were made after the defendant had been arrested and handcuffed. The questioning by the police therefore must be viewed as "custodial interrogation." *Orozco* v. *Texas,* 394 U.S. 324 (1969). See *Commonwealth* v. *Borodine,* 371 Mass. 1, 4-5 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Simpson,* 370 Mass. 119, 125 (1976); *Oregon* v. *Mathiason,* 429 U.S. 492, 495 (1977) (per curiam); *Beckwith* v. *United States,* 425 U.S. 341, 346-348 (1976). Thus, even if the defendant's response — "What can I say?" — were to be characterized as an "equivocal" reply or an adoptive admission and not as an attempt to assert his constitutional right to remain silent, see *Commonwealth* v. *Burke,* 339 Mass. 521, 532 (1959), the evidentiary rule allowing the admission of such statements would not be applicable unless there had been a finding by the judge that the defendant had validly waived his right to remain silent. The waiver must have been made voluntarily, knowingly, and intelligently. *Commonwealth* v. *Hosey,* 368 Mass. 571, 573-574 (1975). *Miranda* v. *Arizona,* 384 U.S. 436, 444 (1966). *Johnson* v. *Zerbst,* 304 U.S. 458, 464 (1938). Moreover, the prosecution carries a heavy burden of proof to demonstrate that a valid waiver was made. *Commonwealth* v. *Borodine, supra* at 6. *Commonwealth* v. *Hosey, supra* at 576-577. *Miranda* v. *Arizona, supra* at 475.

The trial transcript reveals that in the instant case a voir dire on this critical issue was not held; nor was any finding of a waiver made by the judge. Cf. *Commonwealth* v. *Harris,* 371 Mass. 462, 467-474 (1976) (trial judge must conduct voir dire in absence of jury where voluntariness of allegedly coerced confession is in issue, and must make affirmative finding of voluntariness before the jury are allowed to consider it).[1] It is clear that the prosecution failed to meet its

---

[1] Unlike the situation in *Harris* where no objections were made to the admission of the confession, defendant's counsel here repeatedly objected to the prosecutor's questions and police officer's testimony regarding the "What can I say?" and "I have nothing to say" responses. Counsel also properly took exceptions (exception nos. 35, 36, 39, 40 and 41). Excep-

burden and that the testimony of the police officer regarding the responses of the defendant to custodial police interrogations, as well as the questions themselves, were improperly admitted. We note that the testimony of the arresting police officer reveals no attempt on his part to ascertain whether the defendant was desirous of and capable of validly waiving his rights. To the contrary, the response "What can I say?" appears to us to have far more likely indicated an intention to invoke the right to remain silent than an intention to waive that right. This conclusion is substantially reinforced, if not conclusively determined, by the testimony of the same police officer that the defendant's initial response to the police interrogation was: "I have nothing to say." Cf. *Commonwealth* v. *Cain*, 361 Mass. 224, 228 (1972) (assuming the defendant minor was asked in straightforward manner by police whether he wished to waive his rights, the response ["Yes, I didn't do anything"] did not indicate with sufficient clarity an understanding of rights or waiver thereof).

We believe that the foregoing discussion adequately dispenses with the Commonwealth's contention that the defendant's "equivocal response" ("What can I say?") should be construed "as a voluntary acknowledgement by him of the hopelessness of this position, that is to say, of his guilt." It cannot be persuasively contended that the response — "I have nothing to say" — was an admission of guilt. In light of

---

tions 35 and 36 are argued in assignment of error 15 on the following theory: "The trial judge erred in permitting the prosecutor to inquire and witness to answer as to alleged responses of the defendant at the . . . [defendant's father's apartment]. At this point in the proceedings it had not been established that the defendant had been given the requisite 'safeguards' referred to as the Miranda rights. Mere referral by the witness to 'constitutional rights' is not in itself sufficient basis for the admission of the excepted to and alleged replies of the defendant." In his brief, the defendant's counsel argues from this assignment of error that the defendant "has a constitutional right to remain silent in the face of questions put to him while in custody." Although the assignment of error could have more clearly raised this issue, we read it as adequate to preserve the defendant's opportunity to protect important constitutional rights.

the prosecution's unfulfilled burden on the waiver issue, we accept the defendant's argument that both responses manifested his intention to remain silent, and that the prosecutor committed grave constitutional error in eliciting testimony regarding the questions and responses as well as commenting on the testimony during final argument to the jury.

It is apparent from the portions of the trial transcript quoted above that the jury were permitted, and even encouraged, to consider the fact that the defendant fended off police inquiries following his arrest. Although noting that the defendant had a constitutionally protected right to remain silent, the prosecutor in closing argument simultaneously sought to capitalize on this silence by drawing on the jurors' natural tendency to infer guilt from a failure to deny guilt. This type of trial conduct is fundamentally inconsistent with the principle that a defendant who exercises his Fifth Amendment right to remain silent during custodial police interrogation cannot be penalized at trial for taking advantage of his rights. The Supreme Court recently affirmed this principle in the case of *Doyle* v. *Ohio*, 426 U.S. 610 (1976), involving an attempt by a State prosecutor to use the defendants' postarrest silence to impeach their exculpatory testimony at trial. "The warnings mandated by . . . [*Miranda*], as a prophylactic means of safeguarding Fifth Amendment rights, see *Michigan* v. *Tucker*, 417 U.S. 433, 443-444 (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See *United States* v. *Hale*, 422 U.S., at 177 [1975]. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit

to any person who receives the warnings." *Doyle* v. *Ohio, supra* at 617-618 (note omitted). If it is fundamentally unfair and a deprivation of due process to allow an arrested person's silence to be used to impeach an explanation subsequently offered at trial, *id.* at 618, then, a fortiori, it is a violation of due process to allow such silence, or the invocation of the right to remain silent, to be used as evidence of guilt. *Morgan* v. *Hall,* 569 F.2d 1161 (1st Cir. 1978). *United States* v. *Sklaroff,* 552 F.2d 1156, 1161-1162 (5th Cir. 1977), cert. denied sub nom. *Leppo* v. *United States,* 434 U.S. 1009, and sub nom. *Goldstein* v. *United States,* 434 U.S. 1009 (1978). *Chapman* v. *United States,* 547 F.2d 1240, 1242-1246 (5th Cir.), cert. denied, 431 U.S. 908 (1977). *Meeks* v. *Havener,* 545 F.2d 9, 10 (6th Cir.), cert. denied sub nom. *Meeks* v. *Jago,* 433 U.S. 911 (1977). *Booton* v. *Hanauer,* 541 F.2d 296, 298-299 (1st Cir. 1976). *Commonwealth* v. *Bennett,* 2 Mass. App. Ct. 575, 578-582 (1974). Cf. *Doyle* v. *Ohio, supra* at 617; *Harris* v. *New York,* 401 U.S. 222 (1971); *Griffin* v. *California,* 380 U.S. 609 (1965).

We cannot conclude, as the Commonwealth urges, that this constitutional error is harmless beyond a reasonable doubt. See *Chapman* v. *California,* 386 U.S. 18 (1967); *Morgan* v. *Hall, supra.* The repeated objections of the defendant's counsel to the admission of the challenged testimony were all overruled by the judge. Thus, the prejudicial effects of the testimony, and of the prosecutor's remarks in her closing argument, reached the jury with full force and without the potentially countervailing influence of prompt and forceful cautionary instructions by the judge. Contrast *Commonwealth* v. *Morgan,* 369 Mass. 332, 340 (1975), cert. denied, 427 U.S. 905 (1976). *Commonwealth* v. *Eagan,* 357 Mass. 585, 592 (1970). To the contrary, the judge's rulings against the defendant allowed the judicial imprimatur to attach to the inferences of guilt. We cannot overestimate the effect on the jury of erroneously admitted testimony and argument tending to show consciousness of guilt on the part of the defendant. See *Commonwealth* v.

*Burke,* 339 Mass. 521, 532-533 (1959); *United States* v. *Harp,* 536 F.2d 601 (5th Cir. 1976). The sum of the evidence presented against the defendant, although sufficient to withstand the defendant's motion for directed verdict, was not overwhelming. Nor do we believe the impact of the erroneously admitted statements to have been trivial or inconsequential. See *Commonwealth* v. *Morgan, supra* at 341. Because our reading of the record and our assessment of the probable impact on the jury of the objectionable material do not allow us to conclude that the error was harmless beyond a reasonable doubt, see *Harrington* v. *California,* 395 U.S. 250, 254 (1969), we must reverse the conviction.

3. The defendant assigns as error the rulings of the judge regarding the introduction in evidence of "mug shots" of the defendant and testimony relating to those photographs. Because a similar controversy may develop at a new trial, it is proper for us to take this opportunity to comment.

In *Commonwealth* v. *Gerald,* 356 Mass. 386, 387-388 (1969), we acknowledged that use in evidence of police file photographs of the "mug shot" style — showing front and side views with police identification markings — creates a risk that the jury will assume that the defendant has a prior criminal record. In order to avoid such a prejudicial effect where the fact of a prior criminal record is not properly before the jury, we noted that "prosecuting counsel usually should avoid (a) use of such pictures in a form in which they may be identified as police pictures and (b) references in testimony to the files from which they were obtained." *Id.* at 388. See also *Commonwealth* v. *Nassar,* 351 Mass. 37, 42-43 (1966); *S. C.* 354 Mass. 249, 258 (1968); *Commonwealth* v. *McCants,* 3 Mass. App. Ct. 596, 597-598 (1975).

The trial transcript in the instant case indicates that the taxicab driver, in response to the direct examination of the prosecutor, testified that he looked at photographs in the police station on two occasions but was unable to make any identification. Later, he viewed photographs shown him by

a police officer while the two of them were standing on a public street. The taxicab driver made an identification of the dark-complexioned passenger based on one of the photographs shown him on this latter occasion. The police officer also testified that the driver picked out one of the photographs shown to the driver on a city street. There is nothing in the testimony of either witness which is offensive to the directive of *Gerald* that references to the source of identification photographs in police files be avoided. However, the manner of presentation of the photographs themselves in evidence may have created in the minds of the jury an implication that the photographs were police "mug shots." It appears from the transcript that objections and other interchanges among the attorneys and the judge served to focus the jury's attention on the fact that certain markings on the photographs were to be obscured by tape to avoid prejudice to the defendant. However, it should be noted that counsel for the defendant failed to take advantage of the opportunity at a bench conference just prior to introduction of the photographs to have the photographs "sanitized" to the extent possible before the jury were made aware of them. Cf. *Commonwealth* v. *McCants, supra* at 598. See also *United States* v. *Fosher,* 568 F.2d 207 (1st Cir. 1978). Such preventive action would have been desirable and would not have called on the defendant's counsel to exercise extraordinary powers of foresight. The admission of the photographs themselves in evidence did not constitute error.

4. In view of our determination that admission of testimony and prosecutorial argument regarding the failure of the defendant to respond to custodial police interrogation was reversible error, we need not address the many remaining assignments of error presented to us by defense counsel under what appears to be a shotgun theory of appellate argument. We note in passing that a focused and organized presentation of argument is more persuasive, and reduces the possibility that a worthwhile point will be obscured in a torrent of trivial or fanciful contentions.

The judgment is reversed, the verdict set aside and the case remanded for a new trial.

*So ordered.*