COMMONWEALTH vs. BRIAN J. PEIXOTO.

Bristol. December 8, 1999. - January 25, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, & IRELAND, JJ.

*Practice, Criminal,* Admissions and confessions, Harmless error. *Constitutional Law,* Admissions and confessions, Harmless error. *Evidence,* Admissions and confessions, Relevancy and materiality. *Error, Harmless.*

This court concluded that, at the trial of a murder indictment, the prosecutor improperly sought to elicit from the defendant on cross-examination, in violation of the defendant's rights under art. 12 of the Massachusetts Declaration of Rights, the defendant's equivocal prearrest post-Miranda statement to police expressing his reluctance to talk with them without an attorney [657-660]; the error, however, was harmless, in light of the judge's explicit curative instructions to the jury and the evidence against the defendant [660-661].

At the trial of a murder case, the judge did not err in excluding evidence proffered by the defendant that had very little, if any, probative value in establishing that another person had committed the crime. [661-662]

INDICTMENT found and returned in the Superior Court Department on March 20, 1996.

The case was tried before *Charles J. Hely,* J.

*Dana Alan Curhan* for the defendant.

*M. Catherine Huddleson,* Special Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree of the three year old son of his girl friend on a theory of extreme atrocity or cruelty. The defendant's new counsel on appeal argues that the defendant should be retried because (1) the prosecutor improperly brought to the jury's attention his post-Miranda statement expressing his reluctance to talk to the police without an attorney; and (2) the judge should not have excluded evidence of conduct of the victim's sister, suggesting, in the defendant's view, that the mother may have committed the murder. As to the first point, we conclude that there was error, but that it was harmless

beyond a reasonable doubt. We reject the defendant's second argument. There is no reason under G. L. c. 278, § 33E, either to reduce the verdict or to order other relief. We affirm the defendant's conviction.

The jury were warranted in finding the following facts. The defendant lived with his girl friend, Ami Sneed, and her two young children, Christopher and Tarissa. The defendant often cared for the two children while Ami attended school. In the weeks before Christopher's death, the defendant became increasingly angry whenever Christopher wet his pants because he felt that Christopher was old enough to be toilet trained. On the morning of January 22, 1996, Christopher again wet his bed and the defendant, who appeared angry, told Ami that he would change Christopher while she finished getting ready for school. Christopher appeared "wobbly" at breakfast after the defendant had changed him, and he fell asleep in the defendant's truck while they drove Ami to school. The defendant agreed to watch Christopher for the day rather than send him to school.

When Ami returned home later that afternoon, she noticed a new red bump on Christopher's head, which the defendant attributed to Christopher's having fallen down the stairs outside the house. The defendant took Christopher and Tarissa downstairs to the basement to watch a videotape while Ami spoke to Steve Morton, a friend who had spent the night. Morton "heard bumping" and heard Christopher crying. The defendant called up from the basement that Christopher had fallen down the stairs, but he was fine. Later that afternoon, Morton left the defendant's house. The only persons remaining in the home were the defendant, Ami, Christopher, and Tarissa. All four ate pizza and then Christopher and Tarissa went downstairs to the basement to watch a movie. The defendant and Ami watched a television talk-show program upstairs together that prompted a heated argument between them. Their argument moved downstairs, where Ami told the defendant that she was going to move out. She began packing clothes for herself and her two children. The defendant remained downstairs with Christopher and Tarissa while Ami went upstairs to smoke a cigarette.

As Ami finished her cigarette, she heard Tarissa calling her. On her way down the stairs, Ami heard four or five bangs, "like someone was punching the wall." Tarissa was at the bottom of the stairs and asked Ami to pick her up, which she did. Ami

saw the defendant in the basement on his hands and knees cleaning up vomit and Christopher lying on the floor beside him. When Ami asked the defendant what had happened, he stated that Christopher had gotten sick, and he picked Christopher up in his arms and walked toward Ami. Christopher's eyes were rolling in his head and the defendant said to him, "Brian [the defendant] will never yell at you again. Come on, Buddy. Come on, Buddy."

The defendant and Ami drove Christopher to a nearby fire station, and from there he was transported by ambulance to a hospital. Ami continued to ask the defendant what happened. The defendant said he believed Christopher had had a seizure. Immediately before arriving at the hospital, the defendant told Ami that, if Christopher survived, the hospital was not going to give him back to her "because of the bruises." Ami did not know what the defendant meant by this statement, but they arrived at the hospital before the defendant had an opportunity to explain. While at the hospital, the defendant told Ami that Christopher had been banging his head on the floor. The defendant picked up Tarissa and announced that he was leaving and not coming back because he did not want to be blamed for what had happened.

Christopher died at the hospital of blunt force trauma to his head. The medical examiner testified that there were multiple scrapes and contusions over Christopher's head, upper arms, back, legs, chest, and genitals. Many of Christopher's bruises, including those to his head and genitals, occurred at or within minutes of his death. Christopher's diaper was soiled when he died. The police concluded that Christopher's death was suspicious and asked the defendant to come to the police station for an interview. He voluntarily went to the station where he was advised of his Miranda rights.[1] The defendant expressed some reluctance to speak with the police without first consulting an attorney, but shortly thereafter he stated he had "nothing to hide," and he gave a statement. Although the defendant denied responsibility for Christopher's death, and made statements implicating Ami, he volunteered to police that "it pissed him off when Christopher peed his pants, but he didn't want him to be dead." On January 24, the defendant was arrested and charged with Christopher's murder.

---

[1] The defendant was not under arrest at this time and was not subjected to custodial interrogation.

1. The defendant contends that a question and answer exchange between himself and the prosecutor during cross-examination violated the principles in *Doyle* v. *Ohio*, 426 U.S. 610 (1976).[2] In *Doyle*, the prosecutor impeached exculpatory testimony of the two defendants by asking them on cross-examination why they had not explained their conduct at the time of their arrests. *Id.* at 613-616. The United States Supreme Court held that the impeachment violated the due process clause of the Fourteenth Amendment to the United States Constitution, *id.* at 619, because Miranda rights had been given to the defendants and their post-Miranda silence was "insolubly ambiguous because of what the State is required to advise the person arrested." *Id.* at 617. The Court went on to emphasize that Miranda warnings contain an implicit assurance that a defendant's silence after such warnings will carry no penalty. *Id.* at 618. See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 695-696 (1983); *Commonwealth* v. *McClary*, 33 Mass. App. Ct. 678, 684 (1992), cert. denied, 510 U.S. 975 (1993); *Commonwealth* v. *Mosby*, 11 Mass. App. Ct. 1, 5-8 (1980). *Doyle* also protects a defendant's request for a lawyer because the right to an attorney is encompassed within the Miranda warnings, and a claim of that right should not carry any adverse consequences. See *Commonwealth* v. *Beauchamp*, 424 Mass. 682, 690-691 (1997). See also *United States* v. *Daoud*, 741 F.2d 478, 480 (1st Cir. 1984).

The Commonwealth seeks to justify the exchange that occurred by arguing that the reasoning of *Doyle*, and subsequent decisions applying the holding of *Doyle*, are not implicated in this case. The Commonwealth suggests that the defendant's statement, expressing uncertainty whether he wanted to talk to the police without an attorney, did not expressly invoke his right to counsel. The Commonwealth relies on several decisions in which we have examined whether a defendant's equivocal statements concerning a desire for counsel or to remain silent

---

[2]The question and answer read as follows:

THE PROSECUTOR: "And one of the first things you said to the detectives interviewing you is, 'I don't know if I should talk to you or not'; right?"

THE DEFENDANT: "Well, after they read me my rights, part of the rights says that I have the right not to talk without an attorney present, and I thought that maybe I should have an attorney present."

were in fact or law sufficient to trigger a police officer's obliga-
tion to terminate questioning. See *Commonwealth* v. *Hussey
(No. 1)*, 410 Mass. 664, 671, cert. denied, 502 U.S. 988 (1991)
(defendant's statement that "he had nothing else he could say,"
coupled with his "thinking out loud" about whether he should
talk or "shut . . . up," did not amount to invocation of his right
to cut off questioning); *Commonwealth* v. *Todd*, 408 Mass. 724,
726 (1990) (defendant's "wonder[ing] aloud about the advis-
ability of having a lawyer" was not invocation of right to
counsel); *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 265
(1982). The Commonwealth is correct that the defendant's mus-
ing about whether he wanted to continue speaking with the
police in the absence of an attorney was sufficiently ambiguous
so as not to constitute an invocation of his right to counsel or
his right to remain silent. This alone, however, is not dispositive
of the *Doyle* problem.[3]

Testimony about the defendant's reluctance to speak to the
police without an attorney conveyed to the jury the impression
that he was hiding relevant information from the police. The
testimony implicated concerns similar to those protected by the
rule preventing adverse comment on a defendant's actual
exercise of his rights.[4] It is intuitively illogical to allow a
prosecutor to introduce before a jury all of a defendant's state-
ments about his decision to exercise his right to remain silent or
consult with an attorney (or both), but then to exclude the
defendant's final decision claiming either right. Due process
requires that the defendant's statement should not have been
disclosed to the jury.

What has been said is principally based on the *Doyle* deci-
sion, which is designed to safeguard a defendant's Federal due
process rights when he chooses to exercise his right to remain
silent or to have the advice of counsel. At the base of the
jurisprudence is the due process protection that a defendant,
when in the hands of the police, should be able to invoke core
constitutional rights without fear of making implied or adoptive

---

[3]None of the cases relied on by the Commonwealth dealing with equivocal
invocations of rights guaranteed by *Miranda* v. *Arizona*, 384 U.S. 436 (1966),
raised the issue of a possible violation of *Doyle* v. *Ohio*, 426 U.S. 610 (1976).

[4]The fact that the defendant proceeded to speak to police shortly after his
equivocal statement does not alter our conclusion that his initial hesitation
should not have been introduced in evidence. The fact only bears on the issue
whether the error was harmless.

admissions. The same protection has also long been guaranteed by the Massachusetts Constitution. As was said by Justice Cutter writing for the court in *Commonwealth* v. *Sazama*, 339 Mass. 154, 157-158 (1959):

> "A man, being interrogated under circumstances which reveal that he is suspected of crime, even if not under arrest, certainly may properly assert his constitutional right to consult counsel and may refuse, on the advice of counsel or otherwise, to make statements. See art. 12 of the Declaration of Rights of the Constitution of Massachusetts. He may reasonably fear (without any consciousness of guilt whatsoever) that anything he says will be distorted, misquoted, or used as the basis of argument unfairly. If he tries 'to stand clear of all responsibility in relation to whatever might be said' until he has obtained professional advice, or if he acts upon such advice when obtained, 'it is obvious that no admission . . . [is] intended, and that none . . . [can] be legitimately deduced from such a forbearance.' See *Commonwealth* v. *Harvey*, 1 Gray, 487, 489 [1854]. A refusal to talk in the absence of counsel, or upon the advice of counsel, is neither a complete denial of a statement made in a criminal defendant's presence nor absolute silence. It, however, also is not an admission or adoption of the statement but an attempt to assert a constitutional right, which negates any inference of an admission. Such assertions by criminal defendants during police interrogations are not competent testimony against such defendants."

We conclude that the concepts just expressed, supported by the due process safeguards embodied in our State Constitution as well as by the provisions of art. 12, extend to a defendant who is in the hands of the police for interrogation and has received Miranda warnings, and permit him to inquire about his rights to remain silent and to have counsel, to think out loud about these rights, and to engage them, even tentatively, without being subjected at trial to unfair cross-examination. The fact that a defendant is not under formal arrest at the time he expresses his thoughts does not alter this conclusion. See *Commonwealth* v. *Burke*, 339 Mass. 521, 531-533 (1959) (new trial required where police officer allowed to testify about defendant's prearrest statements that he did not want to talk to the police

and that he had engaged lawyer), rev'd on other grounds, *Commonwealth* v. *Beldotti*, 409 Mass. 553, 561 n.6 (1991). See also *Commonwealth* v. *King*, 34 Mass. App. Ct. 466, 469 (1993) (due process violation occurs "even if the defendant had not been formally placed under arrest before he made the remark invoking his right to remain silent"). We emphasize that our holding, which we ground exclusively on State law, is premised on the fact that the defendant's statements were made after Miranda warnings had been given.[5] We are not concerned with when, or in what circumstances, a defendant's prearrest, pre-Miranda silence or equivocal statements constitute implied or adoptive admissions or constitute permissible subjects for cross-examination. See *Commonwealth* v. *Nickerson*, 386 Mass. 54, 59-62 (1982). See also *Commonwealth* v. *Barnoski*, 418 Mass. 523, 536 (1994) (defendant's failure to summon ambulance or call victim's family appropriate subject for cross-examination); *Commonwealth* v. *Aparicio*, 14 Mass. App. Ct. 993, 993 (1982) (defendant's prearrest silence inadmissible where it would not have been "natural" for him to come forward).

We now decide whether the record establishes "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman* v. *California*, 386 U.S. 18, 24 (1967). See *Commonwealth* v. *Alphas, ante* 8, 23 (1999) (Greaney, J., concurring) (in deciding whether error is harmless, "[t]he appellate court . . . inquires whether there is a reasonable possibility that the error might have contributed to the jury's verdict").[6] In making this determination, relevant factors include "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative

---

[5]We reject the Commonwealth's argument that this case is governed by *Jenkins* v. *Anderson*, 447 U.S. 231, 240 (1980) (impeachment by use of prearrest, pre-Miranda silence not violative of due process clause), because the defendant's statement was allegedly made before he was advised of his Miranda rights. The motion judge who denied the defendant's motions to suppress made a specific finding that the defendant's statement regarding his reluctance to speak to police was made after Miranda warnings had been given. We accept this factual finding. We also note that the substance of the defendant's trial testimony indicates that Miranda warnings had already been given.

[6]We apply the harmless error standard because the defendant's trial counsel made a proper objection to the prosecutor's cross-examination.

instructions." *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983).

Shortly after the exchange occurred, the judge gave explicit and thorough instructions to the jury, noted below,[7] emphasizing that the defendant's hesitation to speak to the police, and the fact that he wanted to think about his rights, were not to be held against him in any way. Furthermore, although the prosecutor's question was itself improper, the truly objectionable part of the exchange came from the defendant himself, who gave an unnecessarily narrative answer to a question that could have been answered with a simple "yes" or "no," thereby avoiding any express reference to his desire to consult with an attorney. The prosecutor, in an exercise of prudence, moved on from that line of questioning following the defendant's answer and never made reference to the defendant's statement again. The defendant's ultimate decision to give a statement to the police also mitigates any impermissible inference the jury may have drawn from his initial hesitation to speak with them. Finally, the evidence against the defendant was substantial. We conclude that the error was harmless and does not warrant disturbing the defendant's conviction.

2. The defendant also argues that the judge erred in excluding evidence that Tarissa, the victim's sister, refused her mother's request for a hug shortly after they had arrived at the hospital. The defendant contends that the child's "reaction would have pointed to [her mother] as the killer and therefore would have exculpated the defendant." The judge excluded the evidence on the ground that it had very little, if any, probative value, especially in light of "the particular emotions of the moment."

"Whether evidence is relevant in any particular instance, and whether the probative value of relevant evidence is outweighed by its prejudicial effect, are questions within the sound discretion of the judge. . . . [T]he judge's determination of these questions will be upheld on appeal absent palpable error." *Commonwealth* v. *Valentin*, 420 Mass. 263, 270 (1995), quoting *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990). Here,

---

[7]The judge instructed: "If a person is in a police station and is being questioned and given his rights, and the person is not sure whether he wants to talk or not or expresses some hesitation, wants to think it over, that kind of a statement can't be held against someone. That's just thinking it over. It's a legitimate considering of his rights, and it can't be held against him on his evidence in a criminal case, and I'm sure you won't consider it in that way."

Tarissa's refusal to give her mother a hug, standing alone, is probative of nothing more than the fleeting fickleness of a four year old child. In fact, Tarissa had asked her mother to pick her up immediately after the incident leading to Christopher's death, thereby undercutting the suggestion that Tarissa harbored any ill will toward her mother. The judge acted within his discretion in excluding the evidence.

3. We have reviewed the entire record under G. L. c. 278, § 33E, and conclude that there is no reason to grant the defendant any relief from his conviction of murder in the first degree. The jury obviously disbelieved the defendant's version of this brutal and senseless killing of a helpless child and, as the defendant concedes, the Commonwealth's evidence was sufficient to justify the jury's verdict of murder in the first degree.[8]

*Judgment affirmed.*

---

[8]In seeking relief pursuant to G. L. c. 278, § 33E, the defendant argues that there was a possibility that the victim's mother was the killer and he "asks that this court decline to credit her testimony." Such a request is beyond the scope of our function as an appellate court. See *Commonwealth* v. *Ford*, 397 Mass. 298, 301-302 (1986) ("[c]redibility is for the jury, not for appellate courts"). See also *Commonwealth* v. *Jones*, 45 Mass. App. Ct. 254, 258 (1998).