Commonwealth *vs.* Pasqualino DePace.

Middlesex. November 9, 2000. - February 16, 2001.

Present: Marshall, C.J., Ireland, Spina, Cowin, & Sosman, JJ.

*Practice, Criminal,* Assistance of counsel, Argument by prosecutor. *Constitutional Law,* Assistance of counsel. *Evidence,* Admissions and confessions, Inference. *Due Process of Law,* Inference.

At the trial of a murder indictment in which the defendant did not testify and the sole issue was the identity of the murderer, evidence of the defendant's signed Miranda form on which the police officer noted the defendant's request to talk to his attorney was improperly offered and admitted in evidence; in the circumstances, a substantial likelihood of a miscarriage of justice was created and a new trial was required. [382-387]

Indictment found and returned in the Superior Court Department on April 29, 1997.

The case was tried before *Joseph A. Grasso, Jr.,* J.

*Ruth Greenberg* for the defendant.

*Kimberly Diaz Peterson,* Assistant District Attorney (*Gerard T. Leone, Jr.,* Assistant Attorney General, with her), for the Commonwealth.

Spina, J. The defendant, Pasqualino DePace, was indicted for the murder of his estranged wife. A jury found him guilty of murder in the first degree by reason of extreme atrocity or cruelty. On appeal he claims error in (1) the admission of evidence that he asserted his right to counsel; (2) the judge's instruction on inferences; and (3) the judge's refusal to permit appellate counsel to review confidential juror questionnaires. We reverse on the basis of the first assignment of error and remand for a new trial.

The evidence showed that the defendant was obsessed in his belief that his wife was seeing another man. On Labor Day, 1996, the victim and a female friend went to a Stop & Shop supermarket in Watertown. The victim introduced her friend to a man who worked there as a meat cutter. They had once worked

together at another market. The three conversed for about fifteen minutes, and at one point the victim put her hand on the man's shoulder. Shortly after the conversation ended and the two women left, the defendant approached the man in a back room at the market and accused him of having an affair with his wife. The man denied any relationship with the defendant's wife and walked away. After this incident, the relationship between the defendant and the victim had deteriorated to the point where they stopped speaking to each other and kept separate rooms in the family's Waltham home. The victim slept in the second-floor master bedroom, and the defendant slept on a couch in the basement family room.

One day in early November, 1996, Nicola, the couple's younger son, looked in on his mother. He found her in tears, and she had bruises around her neck. He persuaded her to go to a hospital. Nicola lived in Providence, Rhode Island, but he occasionally stayed overnight at his parents' home. One night in mid-December he was awakened by the sound of the defendant yelling at the victim. The defendant repeated, "You want a divorce. You get the lawyer. I'll sign the papers and just get out of my house."

On December 24, the defendant took Nicola aside and forced him to listen to his complaints. At one point Nicola pleaded with him to get a divorce and divide the marital assets equally. The defendant became angry and said he was "not going to lose everything that [he had] earned," adding that the victim would "never get the satisfaction of a divorce." He then told Nicola that the victim "was going to make [him] kill her," and not to be surprised if some morning she were run over by an automobile. He said he would teach Nicola and his brother "a lesson [they] would never forget."

On March 1, 1997, Nicola visited his mother at the Stop & Shop where she worked. He walked her home and said he would return the following week. He telephoned her at home the next day but the defendant answered and said she was asleep. The defendant was uncharacteristically solicitous of Nicola, who told the defendant he would stop by on Friday evening, March 7. On March 5, the defendant brought $85,000 in a brown paper bag to his brother and asked him to keep it in a safe place for him.

During the early evening of March 6, the victim telephoned two friends. She expected to see one at work the next morning,

and to meet the other on Saturday, March 8. She never arrived at work on March 7, and was never again seen alive. Nicola did not go to his parents' home on the evening of March 7, as planned.

At about noon on Sunday, March 9, Nicola and his girl friend arrived at his parents' home, where they discovered the victim's body in the basement. There was blood on her body and on the carpet. One of his mother's ceramic figurines was broken, but nothing else was disturbed. The dog was in the house and there were no signs of forced entry. A light snow had fallen the night before, and the only footprints in the snow around the house were left by Nicola and his girl friend.

An autopsy revealed that the victim died either from a loss of blood secondary to various head wounds, or from strangulation. The three wounds to the right side of her forehead and nine to the left side of her head were caused by a dull-bladed instrument used in a chopping manner. Her neck had been broken in two places, consistent with strangulation. She died within minutes to an hour of receiving the blows to her head. Her left ring finger was flattened and the ring on her finger had been crushed. The time of death was estimated at between one to five days before her body was found.

The defendant was arrested during the early afternoon of March 9 at a gasoline station in Burlington. He was brought to the Burlington police station, where he was booked and advised of the rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436 (1966). Detectives David Stanley and Brian Lambert of the Waltham police department arrived and read the Miranda warnings to him. The defendant said he wanted to talk to his lawyer. He signed a Miranda rights form, on which Detective Lambert noted the date and time and wrote, "I want to talk to my attorney." The detectives did not interrogate him.[1]

A State trooper photographed the defendant's hands that evening. He had cuts on his left hand at the knuckles on his index finger and the first joint of his middle finger. There were cuts on his right hand at the middle and ring fingers, and a laceration of his palm. He had no cuts on his hands when he was at his karate class on Thursday evening, March 6. Police

---

[1]The defendant filed a motion to suppress statements he made about the cuts on his hands in response to police questions after he requested to speak with an attorney. That motion was allowed, and there was no evidence at trial about any police interrogation.

obtained, through a search warrant for the defendant's Jeep, receipts for the purchase of clothing, adhesive tape, "first aid tape," and bandaids purchased between March 7 and March 9, 1997.

The defendant did not present any evidence after the Commonwealth rested.

*Evidence of defendant's request for a lawyer.* At trial the Commonwealth introduced evidence that the defendant asked to speak with his attorney, after having received the Miranda warnings, through the testimony of Detectives Stanley and Lambert. Detective Lambert testified that he wrote, "I want to talk to my attorney" on the Miranda rights form signed by the defendant. That form was displayed enlarged to the jury by "a visual presenter monitor" during Lambert's testimony. The Miranda form was also admitted as an exhibit. The defendant claims that the admission into evidence of his request to speak to his lawyer violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and under art. 12 of the Massachusetts Declaration of Rights, and thus was reversible error. Because there was no objection, our review is governed by the substantial likelihood of a miscarriage of justice standard. Cf. *Commonwealth* v. *Thompson*, 431 Mass. 100, 117-118 (2000).[2]

In circumstances presented here a defendant may not be impeached with evidence of his silence at the time of arrest and after receiving Miranda warnings without violating the due process clause of the Fourteenth Amendment to the United States Constitution. See *Doyle* v. *Ohio*, 426 U.S. 610, 619 (1976); *Commonwealth* v. *Farley*, 432 Mass. 153, 158 (2000); *Commonwealth* v. *Egardo*, 426 Mass. 48, 51-53 (1997). The

---

[2]There is no merit to the defendant's contention that the motion judge, who was also the trial judge, resurrected the issue for full appellate review by considering the merits of the question, presented for the first time in the defendant's motion for a new trial. See *Commonwealth* v. *Hallet*, 427 Mass. 552, 555 (1998). The judge considered the matter only on the threshold question whether the defendant raised a substantial issue necessitating an evidentiary hearing. See *Commonwealth* v. *DeVincent*, 421 Mass. 64, 67 (1995). He expressly stated in his memorandum of decision that he deemed the issue waived, and he was careful to add, no less than three times, that he was not considering the merits of the question. The judge also stated that he had no intention of resurrecting the issue. In the circumstances, the judge's brief discussion was not a decision on the merits, and the issue has not been restored to full appellate review.

Supreme Court said in *Doyle* v. *Ohio, supra* at 618, that, "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." The prohibition on the use of such evidence is not limited to impeachment of a defendant's subsequent explanation at trial, but also applies whenever it is "used as evidence of guilt." *Commonwealth* v. *Cobb*, 374 Mass. 514, 521 (1978) (evidence of defendant's post-Miranda statement, "What can I say?," deemed exercise of intention to remain silent, improperly introduced during Commonwealth's case-in-chief). See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 694 (1983).

These principles extend to a defendant's postarrest, post-Miranda decision to request an attorney. See *Commonwealth* v. *Beauchamp*, 424 Mass. 682, 690 (1997); *United States* v. *Daoud*, 741 F.2d 478, 480 (1st Cir. 1984). They also are safeguards under art. 12. See *Commonwealth* v. *Peixoto*, 430 Mass. 654, 658-659 (2000), quoting *Commonwealth* v. *Sazama*, 339 Mass. 154, 157-158 (1959). In *Commonwealth* v. *Person*, 400 Mass. 136, 138-142 (1987), we determined that it was improper and prejudicial for the prosecutor to ask the jury to draw an inference of guilt from the defendant's decision to consult an attorney immediately after the shooting, even where the defendant introduced the evidence that he surrendered the gun to his attorney, that his attorney telephoned the police, and that his attorney told the police that the defendant did not wish to make a statement. We said, "The right to the advice of counsel would be of little value if the price for its exercise is the risk of an inference of guilt." *Id.* at 141, quoting *Commonwealth* v. *Burke*, 339 Mass. 521, 533 (1959), overruled on other grounds, *Commonwealth* v. *Beldotti*, 409 Mass. 553 (1991).[3]

The Commonwealth argues that the evidence of the defendant's request for counsel was appropriate, as it explained why the interview ended abruptly. See *Commonwealth* v. *Habarek*, 402 Mass. 105, 110 (1988), *S.C.*, 421 Mass. 1005 (1995). There are rare instances where evidence of a defendant's postarrest, post-Miranda silence or request for counsel may be admissible. Evidence of a defendant's silence may be admitted if, at trial, he claims to have told police at the time of his arrest the

---

[3] "[N]either party is entitled to argue an inference of guilt or innocence from the fact that the defendant sought legal assistance." *Commonwealth* v. *Person*, 400 Mass. 136, 141 n.6 (1987).

exculpatory story he gave at trial. See *Doyle* v. *Ohio, supra* at 619-620 n.11. Similarly, evidence of a defendant's request to speak with an attorney is admissible to explain why the police interview ended abruptly if, at trial, the defendant suggests that the statement he had begun to give ended abruptly because of some impropriety in the interrogation technique used. See *Commonwealth* v. *Habarek, supra.*[4] Such evidence also may be admissible if it would appear that the interview ended abruptly and the jury would be confused. See *Commonwealth* v. *Martinez,* 431 Mass. 168, 183 (2000), quoting *Commonwealth* v. *Habarek, supra.* In such circumstances, a defendant's exercise of his constitutional rights is not being used against him. See *Commonwealth* v. *Waite,* 422 Mass. 792, 798 (1996).

The rule in *Habarek* does not apply to the present case because the defendant never suggested that the police had improperly cut off his opportunity to give a full statement. Here, there was no evidence of any interview, much less one that ended abruptly. Contrary to the Commonwealth's implication, evidence of the Miranda warnings and a defendant's exercise of his Miranda rights are not part of a defendant's statement to police. See *Commonwealth* v. *Cobb, supra.* They are admissible only as the foundation for a statement the defendant actually gives while in custody. See *Miranda* v. *Arizona, supra* at 475-476. In the circumstances here, they "are not competent testimony against" him. *Commonwealth* v. *Sazama, supra* at 158. It was improper to introduce evidence of the defendant's assertion of his right to counsel.

We inquire whether the evidence created a substantial likelihood of a miscarriage of justice. In *Commonwealth* v. *Mahdi, supra* at 696-697, we described five factors that must be considered when determining the effect of error of this type. They are "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or the quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions" (footnotes omitted). Application of those factors to this case weighs heavily against the Commonwealth.

---

[4]We said in *Commonwealth* v. *Waite,* 422 Mass. 792, 799 n.5 (1996), that, "[i]n most cases a defendant's inculpatory statement that terminates in the middle of interrogation will contain enough information that the questioning appears complete to jurors. . . . [P]rosecutors and judges must make efforts to discern ways to present the questioning as complete, so as to prevent the need to explain a seemingly abrupt end to interrogation."

The evidence of the defendant's request to speak to his attorney was introduced by the Commonwealth, not once, but twice. It did not arise through some inadvertence. By design, a "video presenter monitor" was used to maximize the impact on the jury of the written form of the defendant's acknowledgment of the Miranda warnings and his request to speak with an attorney. Although the prosecutor never mentioned the evidence in his closing argument, the special treatment he gave it during the trial signaled its importance and thereby aggravated the error. It received none of the palliative benefits of a curative instruction. See *Commonwealth* v. *Fowler*, 431 Mass. 30, 39 n.12 (2000). Because there was no curative instruction, the jury were permitted to draw an inference of guilt from the defendant's exercise of his right to counsel, which stood out as the only "inculpatory" statement he made after the killing. The enhanced manner in which the evidence was presented and the lack of any justification for its use strongly suggest that it was intended to prejudice the defendant. See *Commonwealth* v. *Somers*, 44 Mass. App. Ct. 920, 923-924 (1998). Cf. *Commonwealth* v. *Peixoto, supra* at 658.

The final factor we consider is the strength of the Commonwealth's case. The Commonwealth argues that there is no substantial likelihood of a miscarriage of justice because the case against the defendant was overwhelming, relying on *Commonwealth* v. *Fowler, supra* at 42-43, and *Commonwealth* v. *Peixoto, supra* at 660-661. The strength of the Commonwealth's case is but one factor which must be considered. In *Commonwealth* v. *Mahdi, supra* at 698, we said, "The weight of the evidence alone is not sufficient, however, to make the district attorney's comments harmless error. The nature of a *Doyle* error is so egregious that reversal is the norm, not the exception." For example, in *Commonwealth* v. *Peixoto, supra* at 661, the strength of the Commonwealth's case, which was "substantial," bolstered the other *Mahdi* factors. The prosecutor had introduced the subject of the defendant's reluctance to speak to police without an attorney, *id.* at 656, but the most harmful evidence of the defendant's exercise of his right to silence came during his own narrative response to the prosecutor's question, which called for a "yes" or "no" answer; the defendant eventually did give a statement to the police, a fact that mitigated the error; the prosecutor did not dwell on the evidence; and the judge gave a prompt and thorough curative instruction. Thus, the *Peixoto*

case does not stand for the proposition that a "substantial" case against the defendant is, by itself, sufficient to prevent reversal for a *Doyle* error. *Id.* at 661.

In order for a *Doyle* error to be harmless based solely on the strength of the Commonwealth's case, the Commonwealth's evidence must be truly overwhelming. In *Commonwealth* v. *Fowler, supra,* the defendant was convicted of the rape and felony-murder of his girl friend's two year old daughter. The prosecutor introduced the improper statement and there was no curative instruction. However, the defendant had been alone with the child at the critical time; his sperm were found in the deceased child's mouth; he made inculpatory statements to the child's mother on the way to a hospital; he fled to Seattle within weeks of learning the results of forensic testing; and he gave conflicting versions of events both before and during his trial. *Id.* at 42. Not only was the Commonwealth's case in *Fowler* overwhelming, but the defendant's multiple accounts of his actions weakened his defense such that the testimony concerning his exercise of the right to remain silent and the prosecutor's comment about it during closing argument "pale[d] into insignificance." *Id.* at 43.

Because the improper evidence went to the issue of identity, we consider the strength of the Commonwealth's case in relation to that issue. *Id. Commonwealth* v. *Mahdi, supra* at 698. Although the Commonwealth introduced strong evidence of the defendant's motive and opportunity,[5] there was other evidence that detracted from the Commonwealth's case. There was some evidence that the defendant was not living at the family home as of March 6. The Commonwealth points to evidence that a neighbor, who lived diagonally across the street, heard the family dog barking outside on Saturday, March 8 at about 5 A.M., but this evidence does not confirm the defendant's presence. The neighbor was never asked if she saw the dog outside, and, contrary to the prosecutor's argument, the defendant was not the only person who could have let it outside. The defendant's older son, Rocco, testified that he telephoned his mother from his place of employment in Europe on Sunday, March 9, at approximately 2 A.M. Central European Time (8 P.M., Eastern Standard Time [EST], Saturday, March 8), but hung up when

---

[5]We note, however, that the jury found murder in the first degree based solely on extreme atrocity or cruelty, rejecting the Commonwealth's theory as to deliberate premeditation.

his father answered. That testimony placed the defendant at the family home on Saturday evening, March 8, but Rocco's credibility came into question because of his open dislike of the defendant, and no telephone records were admitted in evidence to corroborate the telephone call. The Commonwealth's case also lacked forensic corroboration. While there were wounds on the defendant's hands, none of his blood was found at the scene of the crime, and none of the victim's blood was found under his fingernails, in his car, or on his personal possessions seized by the police. Thus, while the case against the defendant was reasonably strong, it cannot be characterized as overwhelming. The improperly admitted evidence of the defendant's request to speak to his attorney was potentially significant in the jury's analysis of the Commonwealth's circumstantial case. We cannot say that the error did not create a substantial likelihood of a miscarriage of justice. There must be a new trial. Because of our disposition of this issue, we do not reach the remaining issues in the defendant's appeal.

The judgment is reversed, the verdict set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*