COMMONWEALTH *vs.* JOHN KING.

No. 92-P-52.

Berkshire. March 9, 1993. - May 10, 1993.

Present: PERRETTA. FINE. & JACOBS.

*Rape. Constitutional Law*, Self-incrimination. *Error*, Harmless.

In the circumstances of a criminal case, evidence that the defendant, in an outburst of profanity, invoked his right to remain silent while being interrogated at the police station, after one question had been asked and immediately before he was placed under arrest, was improperly admitted [468-469]; the error was not harmless beyond a reasonable doubt where the defendant's credibility was a key issue, the alleged victim's testimony contained numerous inconsistencies, and the judge failed to instruct the jury that no unfavorable inference could be drawn against the defendant for exercising his constitutional right to remain silent [469-472].

INDICTMENT found and returned in the Superior Court Department on September 5, 1989.

The case was tried before *Charles R. Alberti*, J.

*Nona E. Walker*, Committee for Public Counsel Services, for the defendant.

*Anne M. Kendall*, Assistant District Attorney, for the Commonwealth.

FINE, J. The questions raised in this appeal from the defendant's conviction of rape of a child (G. L. c. 265, § 23) are whether a statement he made to the police invoking his right to remain silent was properly admitted in evidence and, if not, whether the error was harmless beyond a reasonable doubt. We conclude that there was error and that, in the context of the trial as a whole, it was not harmless beyond a reasonable doubt.

The complainant, Angela,[1] was six at the time of the incident and eight at the time of trial. On August 4, 1988, Angela, her two younger brothers, her mother, and the defendant, attended a church supper in Pittsfield. Afterwards, the defendant left with Angela on his moped. They went first to a store, where he bought her a lunch box and a stuffed animal, and then to Springside Park. They left the moped and walked into the woods. According to Angela, they both "went to the bathroom" and, after she pulled up her underpants, the defendant pulled them down again and "stuck . . . [h]is private part . . . in[to] [her] private part." According to the defendant, after they walked into the woods, he left Angela and, with his back to her, urinated behind a tree, but nothing else occurred.

Two motorcycle police officers on park patrol noticed the moped, heard a voice, walked into the woods, and found the defendant and Angela standing, clothed, facing each other. Angela began to cry. The defendant said "he was just taking the girl for a walk in the woods." When asked if anything had happened, Angela said, "I just want [the defendant] to take me home." Later that evening, she told her mother that the defendant had not touched her. The next day, she told Detective Peter McGuire that right after the defendant pulled down her pants they heard the motorcycles, and nothing else happened.

The complainant's foster mother testified that in October of 1988, while driving by the park about two months after the incident, Angela told her that the defendant had raped her in the park. In August of 1989, a year after the incident, Angela told Detective McGuire that the defendant had raped her in the park and that she had not said so earlier because she was "scared." A physician examined Angela after her 1989 interview with Detective Maguire. Based upon that examination and one he had conducted in 1987, the physician testified that his observations were consistent with penetration or an attempt to penetrate sometime between the dates

---

[1] The name is fictitious.

of the two examinations. The parties stipulated, however, that in 1990 Angela disclosed that she had been raped by two other persons before the incident with the defendant.

The evidentiary issue arose in the following context. Detective McGuire testified that the day after the incident he called the defendant in to the police station for questioning. He gave the defendant the Miranda warnings and then asked the defendant what he was doing in the woods with a six year old girl. The defendant replied that they were going to the park. Defense counsel then objected to any further question about the interview and explained at a bench conference that the answer would reveal that the defendant exercised his right to remain silent. Defense counsel requested a voir dire. At the voir dire hearing, Detective McGuire testified that he proceeded with the interview, informing the defendant that he had talked with Angela and that she had told him that the defendant had pulled down his underpants and hers. With that, the defendant stood up and said, "You're a bunch of fucking assholes" and, "I don't want to talk no more," and the interview ended. The judge decided to allow the testimony. Detective McGuire then related the defendant's remark to the jury. The judge gave an immediate instruction to the effect that the evidence was not an admission, but it was allowed "as a reflection, however you deem appropriate, as to the state of mind of the defendant at the moment in which he was interviewed by the police."

The challenged statement was an exercise by the defendant, after being given the Miranda warnings, of his right under the Fifth Amendment to the United States Constitution to remain silent. "Silence in the wake of these warnings [or the invocation of a right to remain silent] may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. [Citation omitted] Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Doyle* v. *Ohio*, 426 U.S.

610, 617-618 (1976). See *Commonwealth* v. *Sazama*, 339 Mass. 154, 157-158 (1959); *Commonwealth* v. *Burke*, 339 Mass. 521, 532-533 (1959); *Commonwealth* v. *Cobb*, 374 Mass. 514, 516-521 (1978); *Commonwealth* v. *Mahdi*, 388 Mass. 679, 694 (1983). This fundamental rule applies even if the defendant had not been formally placed under arrest before he made the remark invoking his right to remain silent. He was at the police station at the time it was made, he was being questioned in connection with an investigation that had focused on him, he was given the Miranda warnings, and immediately afterwards he was formally placed under arrest.

The Commonwealth's reliance on *Commonwealth* v. *Habarek*, 402 Mass. 105, 110 (1988), is misplaced. In that case, police questioning of a suspect yielded information before the defendant said, "I don't think I want to say any more." On appeal, the court held that the defendant's statement was "introduced in the context of the entire conversation, and was admitted so as not to leave the jury wondering why the interview ended abruptly." *Id.* at 110. In this case, only one question was asked and answered before the question that produced the challenged remark. The one question pertained to the defendant's presence in the park with Angela, a fact not in issue. The only purpose of introducing evidence of the interview could have been to introduce the challenged remark. Admission was not justified, therefore, to show why the questioning ended abruptly.

We turn to the question whether the error was harmless beyond a reasonable doubt. To make that determination, we must consider the entire record of the trial to assess the probable impact of the statement on the jury. See *Commonwealth* v. *Mahdi*, 388 Mass. at 696. We bear in mind that such an "error is so egregious that reversal is the norm, not the exception." *Id.* at 698. Various relevant factors to be considered along with others were pointed out by the court in *Mahdi*[2]; we proceed to consider the circumstances of this case in the light of those factors and others.

---

[2]"(1) [T]he relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum

The defendant makes the following valid points. The key issue at trial was credibility, Angela's and the defendant's. The defendant's refusing to respond to the officer's question rather than denying the accusation related to the defense's premise that the defendant was credible when he testified that he had done nothing to Angela. Regarding the strength of the Commonwealth's case, there were numerous inconsistencies among the various versions of the incident related by Angela to others. She gave widely varying accounts as to what the defendant had done. She first mentioned rape two months after it had allegedly occurred, and on one occasion she stated that it happened while they were kneeling, and, on another, while standing. Even given Angela's age and all the other circumstances of her life,[3] the extent of the inconsistencies was unusual. The physician's testimony added little, if anything, of significance to Angela's testimony, given the stipulation that she had reported that other men had raped her prior to the incident with the defendant. Further, the judge's instructions following admission of the defendant's statement did not cure the error. They failed to inform the jury that no unfavorable inference could be drawn against the defendant for exercising the constitutional right to remain silent of which he had just been informed. Contrast *Commonwealth* v. *Ferreira*, 381 Mass. 306, 314 (1980). Finally, the defendant's statement may have appeared to the jury to have had some importance as it was preceded by an objection, a bench conference, and a recess for the voir dire, and it was followed by an immediate cautionary instruction.

It is true that after introducing the statement through Detective McGuire the Commonwealth never mentioned it again. The statement was not referred to by the prosecutor in argument, and he never asked the jury to use it as a basis for drawing an inference of guilt. Compare *Commonwealth* v.

---

of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions." *Commonwealth* v. *Mahdi*, 388 Mass. at 696-697.

[3]She left her mother's custody after the incident and lived in at least two foster homes.

*Cobb*, 374 Mass. at 517 (The prosecutor repeatedly solicited testimony that the defendant responded to questioning by saying, "What can I say?" and the prosecutor emphasized those responses in closing argument). We also note the Commonwealth's suggestion that the defense used the challenged statement at trial to bolster a theme it introduced earlier in the trial. On cross-examination of one of the two motorcycle police officers who first approached the defendant and Angela in the park, defense counsel brought out the fact that the defendant was very angry and upset when asked if he had touched Angela. Further cross-examination of that witness revealed that, based upon the officers' insinuations that the defendant had acted improperly with Angela in the park, the next day the defendant filed a citizen's complaint. Later in the trial, Detective McGuire was allowed to relate the remark in issue to the jury. While cross-examining Detective McGuire, defense counsel referred to that remark. He then asked: "[The defendant] was rather upset that you had made that type of accusation against him at that point. Would that be fair to say?" The answer was "yes." The matter of the defendant's anger was referred to again during the defendant's direct testimony. The defendant testified that he became angry when the officer at the park insinuated that he "was screwing around with [Angela], which was wrong," and that he filed a citizen's complaint the next day. During closing argument, defense counsel again mentioned that the defendant was so outraged at being falsely accused that he took the unusual step of filing a complaint against the police officers involved.

While the defendant's attitude and statement during the interview with Detective McGuire may have been consistent with his attitude and the statements made one day earlier in the park, which were brought out by defense counsel, the statement in issue differed from the earlier expressions of anger in that the statement in issue was not a denial but a refusal to answer the question. The jury may well have assumed that an innocent person would not have refused to answer a question from a police officer. It is not conclusive on

the issue of prejudice that defense counsel had the officer repeat the challenged statement. Counsel may merely have been responding to the evidence, to which he had forcefully objected, in an effort to make the best of an unavoidable situation.

Considering all the circumstances, we conclude that the error was not harmless beyond a reasonable doubt. The possibility that the verdict was affected by the defendant's outburst was sufficient to make the case fall within the "norm, not the exception," *Commonwealth* v. *Mahdi*, 388 Mass. at 698, and, therefore, to entitle the defendant to a new trial.

Accordingly, the judgment is reversed, the verdict set aside, and the matter is remanded to the Superior Court for any further proceedings which the Commonwealth, in the exercise of its prosecutorial discretion, should seek to pursue.

*So ordered.*