COMMONWEALTH vs. HEATHER ISABELLE.

Bristol. February 10, 2005. - June 1, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Argument by prosecutor, Assistance of counsel. *Constitutional Law,* Assistance of counsel. *Error,* Harmless.

At a criminal trial, the Commonwealth's elicitation of testimony regarding the defendant's request for an attorney, although error, did not warrant reversal of the convictions, where the record established beyond a reasonable doubt that the improper testimony did not contribute to the jury's verdicts. [418-422] SOSMAN, J., dissenting, with whom MARSHALL, C.J., and CORDY, J., joined.

INDICTMENTS found and returned in the Superior Court Department on September 16, 1999.

The cases were tried before *John A. Tierney,* J.

*Michele R. Moretti* for the defendant.

*William R. Connolly,* Assistant District Attorney (*Cynthia M. Brackett,* Assistant District Attorney, with him) for the Commonwealth.

IRELAND, J. A Superior Court jury convicted the defendant of assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A [*b*]) and assault and battery on a child under the age of fourteen years causing substantial bodily injury (G. L. c. 265, § 13J [*b*]). The trial judge sentenced her to five years in State prison for assault and battery by means of a dangerous weapon, and ten years' probation for assault and battery on a child to run from and after incarceration. The defendant appealed, and the Appeals Court affirmed the defendant's convictions. *Commonwealth* v. *Isabelle,* 60 Mass. App. Ct. 1117 (2004). We granted the defendant's application for further appellate review to consider only whether the Commonwealth's elicitation of testimony regarding the defendant's request for an attorney amounted to reversible error. There was clear error.

However, because we conclude, as did the Appeals Court in its unpublished memorandum and order, that the record establishes beyond a reasonable doubt that the improper reference did not contribute to the verdicts, we affirm the defendant's convictions.

*Facts.* The victim, the defendant's daughter, was at the time a twenty-five month old child, who suffered numerous injuries between May 12[1] and May 25, 1999.

On April 30, 1999, the victim was returned to the defendant's home after having been removed by the Department of Social Services (department) on April 16, 1999, due to concerns over domestic violence between the victim's mother and father.[2] Jacqueline Green, the social worker assigned to the case, attempted to see the victim three days after her return, but the defendant refused to let her see the victim. Green attempted to see the victim numerous times by going to the defendant's apartment and sending the defendant letters. The defendant never responded, and between April 30 and May 24, Green was unable to see the victim. During this time, the defendant told Green and Lisa Sullivan, an investigator with the department, that the victim was at her maternal grandfather's home in Rhode Island.[3] At trial, however, the defendant testified that the victim was at Heidi Niemic's[4] home from May 12 until May 25, when Green and the defendant picked her up.

Niemic testified that the victim was in her care from May 20 until the morning of May 23, 1999, when she returned her to the defendant, and then again from the evening of May 23 until

[1]On May 12, a detective with the Fall River police department, at the defendant's apartment on an unrelated matter, observed the victim, and testified that she was "a very interactive little girl," talking and running around the apartment. The victim was wearing a "onesie" that exposed the skin of her arms and legs, and the detective did not observe any injuries to the victim.

[2]The department originally became involved with the defendant's family in September, 1998, because of allegations of substance abuse by the defendant, poor home conditions, and lack of supervision. At that time, the victim and the defendant's other children were placed in foster care. All three children were again removed from the defendant's home in April, 1999. Only the victim was returned to the defendant on April 30; the other two children remained in foster care.

[3]The defendant denied this at trial, claiming that Green and Sullivan were lying.

[4]Heidi Niemic is the niece of the victim's father.

Green and the defendant picked her up on May 25. On May 20, Niemic had noticed a bruise on the victim's face and teeth marks on her inner thighs. She contacted the department but did not file a report because she did not want to "get involved." On May 23, when Niemic again picked up the victim from the defendant, she noticed blisters and bruises on the victim and a red mark in one of the victim's eyes. Niemic also noted that the victim was sluggish, wanted to sleep, and was drooling.

Green testified that when they picked up the victim on May 25 for a meeting with the defendant's attorney, she noticed some of the injuries. When questioned by Green, Niemic said the victim "took a digger."[5] The injuries included various bruises that were in different stages of healing[6]; a subdural hemorrhage[7]; a subconjunctival hemorrhage[8]; petechia (red marks on the skin) and traction alopecia along the victim's hairline, indicating that the victim's hair had been pulled out; and nine lesions consistent with cigarette burns.

Green further testified that the defendant exhibited no reaction to the victim's injuries until Green told the defendant that they were taking her to a hospital.[9] When they arrived, Green had to take the victim into the emergency room herself because the defendant did not move out of the car. Detective Kelly Teves testified that the defendant told her that she wanted to leave the hospital.[10]

*Discussion.* Before trial, the defendant filed a motion in

---

[5]Niemic testified that she lied when she said this because she "was trying to cover" for the defendant.

[6]Reddish bruises indicated injuries inflicted two to three days before a physical examination on May 25, and brownish and fading bruises were approximately seven to ten days old.

[7]This bleeding between the brain and the skull resulted from a violent shaking episode that tore blood vessels in the victim's brain one to two weeks before an MRI examination on May 27.

[8]This red spot on the white of the victim's eye resulted from a violent shaking episode less than one week before the examination.

[9]The defendant denied this, testifying that she immediately began yelling at Niemic for abusing her child. Detective Teves testified that the defendant told her she was so upset that she vomited, a claim that Jacqueline Green's testimony disputed.

[10]The defendant testified that she was told to leave the hospital because the department had obtained a court order barring her from seeing the victim. No evidence of a court order was introduced at trial.

limine to prohibit references to the defendant's request for an attorney during her interrogation by the police.[11] The judge allowed the motion and instructed the prosecutor not to elicit the information. The prosecutor relayed that instruction to the police officers. However, at trial, Detective Teves testified that when asked "if she knew what happened to her baby or if she harmed her baby," the defendant "said she wanted her lawyer." The judge sustained the defendant's objection to the testimony and struck the answer but did not give a curative instruction. The defendant argues that this testimony violated her State and Federal constitutional rights. We agree. This testimony should not have been given, particularly in light of the defendant's motion in limine, which identified the very subject that would elicit the impermissible answer. See *Doyle* v. *Ohio*, 426 U.S. 610, 613-619 (1976); *Commonwealth* v. *Beauchamp*, 424 Mass. 682, 690-691 (1997).[12]

In order for the defendant's convictions to stand, we must be satisfied that the record establishes beyond a reasonable doubt that this improper reference did not contribute to the verdicts. *Commonwealth* v. *Peixoto*, 430 Mass. 654, 660 (2000), and cases cited. In making this determination and assessing the impact of a *Doyle* error, we consider the following factors: "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions" (footnotes omitted). *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983).

Here, although the prosecutor was the one who elicited the erroneous testimony, this was the only reference to the defendant's request for her attorney. Once the detective's response was struck, the Commonwealth did not refer to it

[11]Specifically, the defendant requested that the Commonwealth be precluded from inquiring of the police witnesses the question they asked of the defendant immediately before she requested to speak with her attorney: "I asked her if she ever harmed [the victim]."

[12]We allow the Commonwealth's motion to expand the record and consider portions of the detective's report and the prosecutor's affidavit. The prosecutor's affidavit states that she directed the detective to make no reference to the defendant's request. We have no affidavit from the detective.

again. In addition, the defendant, herself, stated twice during cross-examination that she consulted with her attorney. Moreover, the jury heard other testimony that the defendant currently had an attorney who was representing her in the matter of regaining custody of all of her children. Specifically, the jury heard testimony that the defendant was on her way to a meeting with her attorney when Green decided they were going to the hospital rather than the meeting. Thus, it is likely that the defendant's reference to her attorney was not as significant to the jury as in the ordinary case where there is no evidence that an attorney is currently representing the defendant.

Although the defendant argues that the prosecution deliberately elicited the defendant's request for her attorney, the record makes clear that the prosecutor did not foresee the erroneous testimony. Moreover, while a curative instruction was not immediately given, the defendant did not request one. See *Commonwealth* v. *Qualls*, 440 Mass. 576, 584 (2003), citing *Commonwealth* v. *Leonardi*, 413 Mass. 757, 764 (1992) (no requirement that judge give curative instruction sua sponte). Additionally, when charging the jury, the judge instructed: "[Y]ou may not consider any answers that I struck from the record and told you to disregard. Do not consider such answers." The jury are presumed to follow instructions to disregard testimony. See *Commonwealth* v. *Qualls*, *supra*, citing *Commonwealth* v. *Cortez*, 438 Mass. 123, 130 (2002).

In addition, the premise of the defense was that Niemic or another person injured the victim while she was in Niemic's care. The defendant argues that the case came down to a test of credibility between her and Niemic, and the request for counsel stood out as the only "inculpatory" statement the defendant made. The defendant further argues that her statement had the potential to suggest consciousness of guilt, and therefore struck at the heart of the defendant's story. However, we agree with the Appeals Court that the single reference to her wanting her attorney, followed by the fact that she subsequently gave statements to the police, did little to erode her credibility.

Moreover, in order to find the defendant credible, the jury would have had to disbelieve not only Niemic, but many other witnesses. There were multiple instances where jurors were

required to decide between the defendant's testimony and that of witnesses other than Niemic. First, the defendant denied telling the department that the victim was with her maternal grandfather in Rhode Island, but both Green and Sullivan testified that the defendant told them this. Next, the defendant testified that as soon as she saw the victim at Niemic's house, she began yelling at Niemic for beating the victim. However, Green testified that the defendant showed no emotion until Green said they were taking the victim to the hospital. The defendant also testified that she had given all of her perishable food to her neighbor but this neighbor testified that she never received any food. Last, the defendant testified that she left the hospital because the department had obtained a court order barring her from seeing the victim and she was told to leave, but Detective Teves testified that the defendant said she wanted to leave even when told how seriously the victim was injured.

Furthermore, "[t]he defendant's ultimate decision to give a statement to the police also mitigates any impermissible inference the jury may have drawn from [her] initial hesitation to speak with them." *Commonwealth* v. *Peixoto, supra* at 661. Following her request for her attorney, the defendant proceeded to state that she did not know how the victim was injured because the victim had been with Niemic since May 12. As the Appeals Court noted, this is not a case where the jury were left to speculate as to why the defendant asked to speak with her attorney. Thus, her request to see her attorney did not "convey[] to the jury the impression that [she] was hiding relevant information from the police." *Id.* at 658.

Finally, contrary to the defendant's argument, this is not a case where the evidence tends equally to sustain either of two inconsistent propositions. Rather, there was substantial evidence of the defendant's guilt. In addition to the challenges to the defendant's version of events, there was other evidence that the jury could have considered. For example, after the victim was returned to her, the defendant refused to let employees of the department see the victim until a court ordered her to produce the victim. There was also evidence that the defendant smoked cigarettes but no evidence that Niemic or anyone in her house did, which may have had some relevance to the cigarette burns

on the victim. The defendant testified that she was unable to keep her household together as she had no electricity and no food. Additionally, both the police and department's employees testified that the defendant had no interest in the victim's injuries.

*Conclusion.* Because we conclude that the record establishes beyond a reasonable doubt that the improper reference to the defendant's request to speak with her attorney did not contribute to the verdicts, we affirm her convictions.

*So ordered.*

SOSMAN, J. (dissenting, with whom Marshall, C.J., and Cordy, J., join). In violation of the judge's ruling on the defendant's motion in limine, the prosecutor elicited testimony that the defendant's response to being asked whether she had hurt her baby was that she "wanted her lawyer." This testimony was contrary to well-known constitutional principles, as a defendant's exercise of the right to remain silent or to speak with counsel should not be burdened by allowing the exercise of that right to appear as an adoptive admission or as consciousness of guilt. See *Doyle* v. *Ohio*, 426 U.S. 610, 613-619 (1976) (*Doyle*); *Commonwealth* v. *Mahdi*, 388 Mass. 679, 694-695 & n.15 (1983), and cases cited. When it occurs, "[t]he nature of a *Doyle* error is so egregious that reversal is the norm, not the exception." *Id.* at 698. "The circumstances under which [a *Doyle* error] will not occasion a reversal are few and discrete." *Id.*, quoting *United States* v. *Edwards*, 576 F.2d 1152, 1155 (5th Cir. 1978). In line with the stringent standards by which we are to assess such an error, I see nothing in today's case that would excuse it from the "norm" of reversal.

The defendant made a timely objection to the *Doyle* error, and we must therefore reverse the conviction unless we find that that error was harmless beyond a reasonable doubt. *Commonwealth* v. *Peixoto*, 430 Mass. 654, 660 (2000), quoting *Chapman* v. *California*, 386 U.S. 18, 24 (1967). *Commonwealth* v. *Mahdi*, *supra* at 696. In assessing the impact of a *Doyle* error, we consider the following factors: (1) the relationship

between the evidence and the premise of the defense; (2) who introduced the evidence at trial; (3) the weight or the quantum of the evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions. *Commonwealth* v. *DePace*, 433 Mass. 379, 384 (2001), *S.C.*, 442 Mass. 739 (2004), cert. denied, 125 S. Ct. 1842 (2005), quoting *Commonwealth* v. *Mahdi, supra* at 696-697. The only factor that favors the Commonwealth in the present case is the fourth factor, as there was but a single reference during the detective's testimony to the defendant's request to consult with counsel, and there was no further reference to that testimony during the prosecutor's closing argument.[1] However, the remaining factors all point toward reversal.

The premise of the defense was that the child had been in the exclusive care of Heidi Niemic throughout the period during which the injuries had been inflicted. Niemic acknowledged that the child had been with her during at least portions of that time period, but claimed that she had not had care of the child until May 20, 1999 (whereas the defendant testified that she had placed the child with Niemic on May 12) and that she had returned the child to Niemic's care for approximately seven hours during the day of May 23 (whereas the defendant testified that the child had not been with her at all that day). Niemic claimed to have observed injuries on the child when she first arrived on May 20, and to have observed additional injuries when the child was returned to her on May 23 after allegedly spending the day with the defendant. The defendant claimed that the child had been uninjured when she turned her over to Niemic on May 12,[2] and was appalled to discover her condition when the child was retrieved on May 25. In resolving this credibility dispute between the defendant and Niemic, on which the entire case hinged, any evidence suggesting consciousness of guilt on the defendant's part would be damaging to the defense. As it turned out, the only — or at least the clearest — consciousness

[1]Although there was only a single reference, the trial itself was quite short, with the presentation of evidence taking barely more than one day. As such, this was not a case where the impact of the error would have dissipated over time or been offset by voluminous or complex evidence.

[2]A detective had seen the child that day, while at the defendant's apartment on another matter, and had seen no injuries on her at that time.

of guilt evidence that came before the jury was evidence that the defendant's immediate response to being asked whether she had injured her child was a request to see her lawyer.[3] The introduction of improper consciousness of guilt evidence was closely related to the premise of the defense, and was detrimental to that defense. See *Commonwealth* v. *DePace, supra* at 385 (defendant's assertion of right to remain silent was "only 'inculpatory' statement" defendant made; despite absence of objection, *Doyle* error required reversal). The first factor thus points toward reversal.

As to the second factor, the prosecutor introduced the evidence of the defendant's request for an attorney. It was not a subject that had been opened up or alluded to by the defense, nor was there an arguable basis for the prosecutor to have introduced it. To the contrary, the issue had been the subject of a pretrial motion in limine, and the court's ruling allowing that motion had alerted the prosecutor to an issue of constitutional dimension that should have been appreciated even without such a motion: references to the defendant's invocation of her constitutional rights during police questioning would be improper. The court today opts to allow the Commonwealth to expand the record to introduce the prosecutor's affidavit, in which she explains that she had advised the witness not to make any reference to the defendant's request for a lawyer. *Ante* at 419 n.12. We do not have any affidavit from the witness, and are not in any position to assess precisely who is to blame for

---

[3]Evidence that the defendant had had no reaction to observing the child's injuries on May 25, that she had remained passive while the social worker took the child into the hospital, and that she subsequently left the hospital, are arguably reflective of consciousness of guilt, but they are far more amorphous than the defendant's response to a direct accusation on the subject of the child's injuries. Moreover, oddity in the defendant's reactions to these events must be interpreted in light of other circumstances — the defendant was utterly destitute (living in an apartment without food, telephone, or electricity); her boy friend (the victim's father) had been arrested for beating and raping the defendant on May 11, triggering the need to place the child elsewhere; she had a longstanding drug addiction; and two of her other children had already been taken away from her and placed with foster families. That her behavior on seeing her obviously injured child on May 25 was not that of a "typical" concerned mother is not clear evidence reflecting consciousness of guilt. In apparent recognition that this evidence did not amount to consciousness of guilt, there was no instruction on consciousness of guilt.

violating the judge's ruling on the motion in limine. Whether it is the fault of the prosecutor or the fault of the detective who testified is of no consequence — the error is squarely attributable to the Commonwealth, and the jury heard this evidence as part of the Commonwealth's case-in-chief. Accordingly, this second factor also points to reversal.

The court today relies strongly on what it perceives to be the weight of the evidence, suggesting that because there was "substantial evidence" of the defendant's guilt, the third factor tips the scales in favor of the Commonwealth. *Ante* at 421. When assessing the impact of a *Doyle* error, the fact that the evidence was sufficient to support the verdict, or even that it was "substantial," does not operate to render the error harmless when other factors point in the opposite direction. Rather, when relying on this factor as the principal ground for finding a *Doyle* error harmless beyond a reasonable doubt, we ordinarily consider whether the evidence of guilt was "overwhelming," such that the jury's improper consideration of a defendant's exercise of a constitutional right could not have affected the outcome. See, e.g., *Commonwealth* v. *DePace, supra* at 386 (Commonwealth's evidence must be "truly overwhelming"). Where the evidence pointing toward guilt is "conflicting," and other factors already point in favor of reversal, the error cannot be harmless beyond a reasonable doubt. *Commonwealth* v. *Mahdi, supra* at 698.

As discussed above, the evidence of the defendant's guilt in this case was starkly "conflicting," with the defendant and Niemic accusing each other of inflicting the injuries on the child. The court today points to aspects of the defendant's testimony that were controverted by witnesses other than Niemic, correctly noting that the jury had ample grounds on which to conclude that the defendant was not trustworthy. *Ante* at 420-421. However, the jury had equally solid grounds for finding Niemic untrustworthy. Niemic had lied about the source of the child's injuries, initially telling the social worker that the child's injuries were the result of a fall. Despite allegedly observing successive injuries to the child, Niemic did nothing to obtain

medical care for those escalating injuries, did nothing to get help from the authorities,[4] and did not even ask the defendant about the injuries. And, with respect to Niemic's claim that the child had been returned to the defendant's care during the daytime hours of May 23,[5] the defendant presented a witness who had been with her at a neighborhood cookout throughout those hours, and had been in and out of the defendant's apartment over the course of the day. She did not see the child at the event or in the defendant's apartment at any time that day.

The jury may well have had good grounds for determining that the defendant and the defendant's neighbor were less credible than Niemic. For our present purposes, however, that is not the point. The issue is whether the evidence was "truly overwhelming." *Commonwealth* v. *DePace, supra.* It was not. It was an entirely circumstantial case, with "conflicting" evidence as to whether the defendant even had the child in her care during the relevant time periods. *Commonwealth* v. *Mahdi, supra.* Where all but one of the other factors point in favor of reversing the convictions, the mere fact that there was "substantial" evidence of guilt, *ante* at 421, does not suffice to render the *Doyle* error harmless beyond a reasonable doubt.

On the final factor, there was no curative instruction given. The evidence was struck, without any explanation or instruction

---

[4]Niemic claimed that she had placed an anonymous telephone call to the Department of Social Services (department) when the child had been turned over to her in an injured state on May 20, but she then avoided answering questions and did not follow through with any actual report. She attributed that failure to report to her desire not to "get involved." However, if she did not want to "get involved," why would she have made any telephone call to the department in the first place? And, whatever her disinclination to "get involved" may have been when she saw the first set of injuries, why was there no response when the child was allegedly returned to her care on May 23 with additional, fresh injuries?

[5]The forensic evidence yielded a range of estimates as to when the various injuries had been inflicted on the child. Other than the day of May 23 itself, Niemic acknowledged that the child was with her from May 20 until May 25. In order for the defendant to have inflicted certain of the injuries discovered, the child would have to have been in the defendant's care at some point during that time frame. Hence, the dispute concerning the child's whereabouts on May 23 is of great significance to determining whether the defendant was responsible for the child's injuries.

on the subject.[6] We have recognized that prompt, curative instructions can suffice to offset a *Doyle* error. See *Commonwealth* v. *Peixoto*, 430 Mass. 654, 661 & n.7 (2000) (judge gave "explicit and thorough instructions . . . emphasizing that the defendant's hesitation to speak to the police, and the fact that he wanted to think about his rights, were not to be held against him in any way"). See also *Commonwealth* v. *Brum*, 438 Mass. 103, 114-115, 121-122 & n.24 (2002) (strong curative instruction reinforced by requiring jurors to write instruction in notebooks). A mere striking of the evidence, or an instruction to "disregard" it, does not have the same effect. See *United States* v. *Impson*, 531 F.2d 274, 276, 278 (5th Cir. 1976) (single reference to defendant's invocation of right to remain silent, followed by instruction to "disregard" witness's answer, amounts to reversible *Doyle* error unless evidence against defendant is "overwhelming"). Indeed, even where evidence of a defendant's assertion of his rights has been properly introduced for a limited purpose under *Commonwealth* v. *Habarek*, 402 Mass. 105, 109-110 (1988), *S.C.*, 421 Mass. 1005 (1995), the defendant is entitled to a prompt limiting instruction advising the jury "that the defendant has a constitutional right not to answer questions asked by the police, that the testimony was admitted only for the purpose of explaining why the interview ended, and that the jury should not draw any adverse inference against the defendant because of his silence." *Commonwealth* v. *Fowler*, 431 Mass. 30, 39 n.12 (2000). Nothing in this case informed the jury that the defendant had a right to ask

---

[6]When the detective testified to the defendant's request for a lawyer, and defense counsel objected, the judge ruled, "Yes. Sustained. Stricken. It's stricken." Testimony then resumed. The Commonwealth relies on the fact that, during his final instructions, the judge told the jury not to consider "any answers that [he] struck from the record and told [them] to disregard." At the time the *Doyle* error was committed, the jury heard only the word "stricken" — they were not told what was being "stricken," nor were they told to "disregard" the detective's answer.

The court correctly notes that defense counsel did not request any specific curative instruction. *Ante* at 420. In assessing the impact of the *Doyle* error, however, we should consider what the jury did and did not hear, not what additional precautions might have been requested. It is particularly unfair to hold it against the defendant that she did not ask for an additional instruction, when her counsel had already filed — and prevailed on — a motion in limine to keep this evidence from the jury in the first place.

for her lawyer, or that her exercise of that right could not be used against her.

The factors set forth above are "not exclusive or exhaustive" of what we may consider in assessing whether a *Doyle* error was harmless. *Commonwealth* v. *Mahdi, supra* at 697. Appropriately, the court today considers whether any other aspects of the trial operated to mitigate or reduce the harmful effect of such an error. From other evidence explaining that the defendant already had an attorney in connection with pending proceedings regarding custody of her other children, there would arguably be less sting from her statement that she wanted to consult with her attorney. See *ante* at 420. It is also true that the defendant, notwithstanding that she "wanted her lawyer," gave a statement in which she denied injuring her child and claimed that the child had been with Niemic throughout — as such, the jury would not have been left with the impression that the defendant was "hiding relevant information from the police." *Commonwealth* v. *Peixoto, supra* at 658. However, what the jury heard was that the defendant's very first reaction to being confronted with the child's injuries was that she wanted her lawyer. That she gave subsequent exculpatory statements would not erase the consciousness of guilt overtones from her immediate, spontaneous reaction to the detective's accusation.[7]

And, considering factors beyond the four corners of the nonexclusive list set forth in *Commonwealth* v. *Mahdi, supra* at 696-697, we must give some weight to the fact that this particular error occurred despite the judge's ruling on a motion in limine. Attorneys do not bring such motions as empty gestures. Rather, they go to the effort of filing motions in limine because of their assessment that the issue is important to their strategy, that there is a likelihood that the error may occur, and that they do not want to rely on post hoc remedies, such as curative instructions or the striking of evidence, to undo the

---

[7] Ironically, the detective's report places the defendant's request for her attorney at the end of her statement, and indicates that "[q]uestioning ceased immediately." If the report is accurate as to the sequence, the jury were given erroneous information as to the defendant's initial reaction to questioning. If the sequence was that testified to at trial by the detective, it would appear that questioning did not "cease[] immediately" in response to the defendant's invocation of her rights.

damage caused by such an error. Here, counsel foresaw that a *Doyle* error might occur, and, in advance, assessed that it would be particularly troubling to the defense. Having taken appropriate steps to see to it that no *Doyle* error would be committed, and having deservedly prevailed on that motion in limine and obtained an order excluding the evidence, it is troublesome in the extreme that the Commonwealth proceeded to violate that order. Given the serious nature of any *Doyle* error, a defendant should not have to file a motion in limine to prevent it — any prosecutor, and any detective of any experience, should know that references to a defendant's request for a lawyer, or to a defendant's decision to remain silent, are inherently problematic. When the issue has been brought to the Commonwealth's attention, by way of a motion in limine that identified the precise question that would elicit the inadmissible testimony of the detective, and the court has ordered the Commonwealth not to introduce such testimony, utmost care should have been exercised as the prosecutor approached the very question that the motion had warned about, and it is inexcusable that the detective would give the very answer that she had allegedly been told not to give.[8] In my view, the Commonwealth, by its misconduct, obtained an advantage that it did not deserve, and I cannot say beyond a reasonable doubt that that unfair advantage had no impact on what appears to have been a classic, triable case.

We cannot allow the rigorous standards that we apply to preserved *Doyle* errors to degrade into something akin to the substantial risk of a miscarriage of justice standard that we apply to unpreserved errors, and we certainly should not tolerate

---

[8] The motion in limine had described the subject matter defense counsel was seeking to exclude ("references to the defendant having requested an attorney during questioning by police on May 25, 1999"), and then asked specifically that the "Commonwealth be precluded from inquiring of its police or other witnesses regarding the question asked of the defendant immediately prior to her request for an attorney: 'I asked her if she ever harmed [her baby].' " The quoted question was then attributed to the report of the detective, by name, who had questioned the defendant. The *Doyle* error was committed when that same detective was on the stand. She testified that she asked the defendant "if she knew what happened to her baby or if she harmed her baby." The prosecutor then asked, "And what did she say?" The detective replied, "She said she wanted her lawyer."

such degradation of our standards in a case where defense counsel did everything possible to prevent a *Doyle* error from occurring. Where the "norm" is to be reversal, even in the case of an ordinary *Doyle* error, see *Commonwealth* v. *Mahdi, supra* at 698, I see no reason to make an exception for a *Doyle* error that has occurred in circumstances as egregious as these. Belief that there was "substantial" evidence of the defendant's guilt does not suffice to take this case out of that "norm." I therefore respectfully dissent.