COMMONWEALTH *vs.* BRIAN E. CHASE.

No. 06-P-1206.

Norfolk. October 10, 2007. - December 13, 2007.

Present: GRASSO, McHUGH, & KAFKER, JJ.

*Constitutional Law,* Admissions and confessions, Harmless error. *Practice, Criminal,* Admissions and confessions, Harmless error, Restitution. *Evidence,* Admissions and confessions. *Error, Harmless. Restitution.*

Certain statements made by a criminal defendant to a State trooper constituted unequivocal invocations of the defendant's right to remain silent, and the trooper's references to those statements during direct examination at trial constituted error, even though struck from evidence after the defendant's objection [830-833]; however, the error was harmless beyond a reasonable doubt, where there was very strong circumstantial evidence of the defendant's guilt and significant evidence of consciousness of guilt on the part of the defendant that did not involve the assertion of his right to remain silent, and where the erroneously admitted statements were confined to the trooper's testimony and were not echoed by the prosecutor in his questions, opening statement, or closing argument [833-836].

In a criminal case, the trial court judge did not abuse his discretion in denying a motion for a new trial on the issue of restitution, brought by the defendant on the ground that the judge had arrived at the amount of restitution without a consideration of the defendant's ability to pay, where the defendant never suggested an inability to pay during the hearing, and where the defendant could raise his inability to pay at any future probation revocation hearing that should take place based on his nonpayment. [836-838]

COMPLAINT received and sworn to in the Dedham Division of the District Court Department on March 4, 2004.

The case was tried before *James H. Wexler,* J.; a restitution hearing was held before *Matthew J. Nestor,* J., and a motion to reopen the restitution hearing to allow additional testimony was considered by him.

*Christopher L. Maclachlan* for the defendant.

*Michael J. Markoff,* Assistant District Attorney, for the Commonwealth.

KAFKER, J. Suspected of breaking into and setting fire to his father-in-law's business, the defendant, Brian E. Chase, twice told a police investigator that he was not talking. At trial, over defense counsel's objection, the officer testified to both statements. The judge struck both statements.

The defendant was convicted of burning personalty in violation of G. L. c. 266, § 5; breaking and entering in the nighttime with intent to commit a felony, in violation of G. L. c. 266, § 16; and malicious destruction of property over $250, in violation of G. L. c. 266, § 127. On appeal he raises a variety of issues associated with the officer's testimony regarding the defendant's assertion of his right to remain silent. Applying the five-factor test announced in *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983), we conclude that the improper testimony by the officer was harmless beyond a reasonable doubt.[1]

*Background.* New Wave Electronics (New Wave) is a small manufacturer of electric components. Sometime in the night of October 2 or early in the morning of October 3, 2002, someone tried to break into the offices of New Wave through a side door to which a deadbolt had recently been added.[2] Unsuccessful, the perpetrator then pried open the front door and turned on the office lights by using a circuit breaker (the only means of operating the lights at New Wave) that was "tucked away" in a side corridor of the office. The perpetrator then went through the drawers of a single desk and set a small fire on top of the desk. Until a few weeks before, the desk had been used by the owner of the business, Kevin Burke, to store cash. The break-in occurred on a Wednesday night. According to Burke, it was common knowledge among his employees that Wednesday was the one night of the week that he typically did not return to the office to work late into the early hours of the morning.

During the investigation of the fire, the police found sneaker

---

[1]The defendant also appeals the denial of a motion pursuant to Mass.R. Crim.P. 30(b), as appearing in 435 Mass. 1501 (2001), related to an order of restitution in the amount of $43,421. We address this issue in part 3, *infra.*

[2]New Wave was located on the second floor of a "factory-type warehouse building" in which a number of businesses were located. No other businesses were broken into that evening.

prints on pieces of sheetrock and plywood near the side door. The print on the sheetrock had apparently been protected from the soot of the fire by the plywood that had ended up lying on top of it.

The defendant had worked at the shop until a month before the break-in. He had not, however, been issued a key. At the time he worked at New Wave there was no deadbolt on the side door and it was easy to pry open. Both the defendant and other employees were aware of this. At trial, other New Wave employees testified that the defendant had referred to the side door as his "private entrance" when he worked at New Wave. The deadbolt was added because a new business was moving in next door and there was going to be construction to get the place ready. The sheetrock and plywood were part of the construction project.

On the night of the fire, the defendant had been out until after 3:00 A.M. When first informed of the fire by his wife, with whom he was having marital difficulties, the defendant had no reaction. When first questioned by the police later that day, his response, immediately after they introduced themselves, was, "What are you guys following me?"

A search warrant was issued for the defendant's sneakers. The sneakers were found in a car without a license plate parked outside the defendant's home. The car had not been driven since 1999. The sneakers had been washed and wrapped in two plastic bags found inside a canvas bag. The sneakers were compared to the prints found at New Wave. A police expert testified that the sneakers found in the car and the sneaker prints found at the scene "corresponded in physical size and dimension, manufacturing characteristics or design features . . . and also in specific degree in areas of wear." The right sneaker also contained a gouge on the top of the heel that matched the sneaker print found at the shop. The police expert testified that the gouge "could be from wear and tear or it could be a cut from an abrasive surface or it could be a manufacturing characteristic"; in the latter case, such a mark "would be common to every footwear made in that particular mold." The possibility that the gouge came from a mold was later described as "slight." Nevertheless, the expert testified that, "[w]ithout examining the specific molds that made

these footwear," she could not determine that the gouge appearing in the print could be identified as coming from the sneaker found in the car, "to the exclusion of all others." However, the expert also stated that she had never seen two pairs of shoes "worn the exact same way," and that she had based her opinion on the over-all degree and areas of wear on the sneakers as compared to the prints.

On the first day of trial, the prosecution called a State police trooper, who was responsible for much of the investigation into the fire. As part of his testimony, he recounted the two interactions with the defendant that form the basis for this appeal. The first interaction involved questioning of the defendant by the trooper, a police sergeant, and a fire investigator at the defendant's home. At the beginning of the interview, the defendant was given Miranda warnings and was informed that he was not under arrest. He was then asked whether he had been driving a maroon Dodge Durango the night before, and he said he had.[3] He was then asked where he had gone the night before, and he responded that he had been to a couple of bars in Norwood. He then refused to give the names of the bars, and then said that he was never in the town of Norwood.

As the interview proceeded, the defendant became increasingly agitated. The trooper testified over the defendant's objection and after a brief sidebar[4] that, at the end of the interview, the defendant said, "Get the fuck out of my house. I ain't talking to you any more." The defendant objected, and the judge struck the second sentence and instructed the jury to disregard it. Trial counsel did not request a curative instruction specifically referencing the defendant's right to remain silent.

Soon afterwards, the trooper testified about the execution of a

[3] A dark sport utility vehicle had been seen in the parking lot of New Wave's building on the night of the fire.

[4] The sidebar was not audible, and thus its contents were not included in the trial transcript. However, the defendant's trial counsel submitted an affidavit describing the sidebar with the defendant's record appendix. Trial counsel anticipated the answer to the question, since it had been in the trooper's report, and sought to have both sentences excluded. The judge ruled that the prosecution could not introduce the second sentence, but could introduce the first. At oral argument, the Commonwealth accepted this description of the sidebar.

search warrant on the defendant's house. The trooper testified that when he asked the defendant to produce the shoes described in the warrant to avoid the difficulty of a search, the defendant responded, "Do whatever you want to do. I'm not talking." Again the defendant objected, and the judge instructed the jury to disregard the second sentence. Again no curative instruction specifically referencing the right to remain silent was requested or given. After the conclusion of that day's testimony, trial counsel moved to have both of the previously admitted statements — "Get the fuck out of my house," and "Do whatever you want to do" — struck from the record, with an instruction that they be disregarded; the judge denied the motion.[5]

The defense rested without putting on any witnesses. The prosecutor did not reference either of the struck pieces of testimony in opening statement or closing argument, although he did reference the other challenged statements described above. The jury returned guilty verdicts against the defendant, which the defendant now appeals.

*Discussion. 1. Protected invocations of the right to silence.* The defendant argues that the testimony described above improperly commented upon his assertion of his constitutional right to remain silent and requires reversal of all of his convictions. The Commonwealth responds that the statements allowed in evidence were not invocations of the right to remain silent. The Commonwealth further contends that the statements invoking the right to remain silent that the jury heard but the judge struck were harmless beyond a reasonable doubt. In its brief, the Commonwealth also draws distinctions between postarrest, post-Miranda exercises of the right to remain silent, see *Doyle* v. *Ohio*, 426 U.S. 610 (1976), and the prearrest exercises of the right to remain silent in the instant case.

Assertion of the right to remain silent is highly protected under Federal and State constitutional law. See, e.g., *Com-*

---

[5]The defendant also complains that the Commonwealth continued to pursue this impermissible line of questioning on the second day of trial, when the Commonwealth elicited testimony from the fire investigator and the police sergeant who were present when the trooper questioned the defendant at his home. Both witnesses confirmed that the defendant asked them to leave. Neither witness referred to the defendant's statement that he was not talking any more.

*monwealth* v. *Mahdi*, 388 Mass. at 694-698; *Commonwealth* v. *DePace*, 433 Mass. 379, 382-383 (2001); *Commonwealth* v. *King*, 34 Mass. App. Ct. 466, 468-469 (1993); *Commonwealth* v. *Andujar*, 57 Mass. App. Ct. 529, 536-537 (2003). "At the base of the jurisprudence is the due process protection that a defendant, when in the hands of the police, should be able to invoke core constitutional rights without fear of making implied or adoptive admissions" or demonstrating consciousness of guilt. *Commonwealth* v. *Peixoto*, 430 Mass. 654, 658-659 (2000). See *Commonwealth* v. *Sazama*, 339 Mass. 154, 157 (1959); *Commonwealth* v. *Burke*, 339 Mass. 521, 532 (1959), rev'd on other grounds, *Commonwealth* v. *Beldotti*, 409 Mass. 553 (1991); *Commonwealth* v. *King, supra.* As Justice Cutter stated, in interpreting art. 12 of the Massachusetts Declaration of Rights, a defendant "being interrogated under circumstances which reveal that he is suspected of crime, even if not under arrest, certainly may properly assert his constitutional right to consult counsel and may refuse, on the advice of counsel or otherwise, to make statements. . . . Such assertions by criminal defendants during police interrogations are not competent testimony against such defendants." *Commonwealth* v. *Sazama*, 339 Mass. at 157-158.

First, we address which of the defendant's statements were actually protected invocations of the right to remain silent. The trial judge considered "Get the fuck out of my house. I ain't talking to you any more" to contain two separate statements. He determined that "Get the fuck out of my house" was not an invocation of the right to silence, while "I ain't talking to you any more" was an invocation of the right. We discern no error in the judge's analysis. After being given Miranda warnings and being told that he was not under arrest, the defendant chose to speak to the police officers. Eventually, after becoming agitated, he told them to leave. The statement does not expressly invoke his right to remain silent, and it is separable from the statement that follows.[6]

The second two statements are separable for the same reasons.

[6]We recognize that the separability of the two statements is a close question. In this context, where the defendant had been speaking to the police after being given Miranda warnings, we think the line drawn by the judge was per-

As the defendant was presented with the search warrant, an officer asked for the location of the sneakers. The defendant then responded, "Do whatever you want to do. I'm not talking." The first sentence does not invoke his right to remain silent but is rather a response to the search warrant. It also provides an explanation for the officer's subsequent actions that located the sneakers.

In contrast, "I ain't talking anymore" or "I'm not talking" are unequivocal assertions of the right to remain silent. See *Commonwealth* v. *Burke*, 339 Mass. at 531 ("I don't want to talk to you or any other police official regarding this matter"); *Commonwealth* v. *King*, 34 Mass. App. Ct. at 468 ("I don't want to talk no more"). The first statement was also made after the defendant received Miranda warnings. Those warnings create an implicit assurance that invocation of the rights described therein will not be used against the person asserting them. *Doyle* v. *Ohio*, 426 U.S. at 618. *Commonwealth* v. *Peixoto*, 430 Mass. at 658-659. This is true whether or not the defendant was under arrest or in custody, as the Commonwealth correctly conceded at oral argument. *Id.* at 659-660.

The second statement was made four days after the Miranda warnings had been given, and at a time when the defendant was neither under arrest nor in custody. The warnings had not been renewed. Thus, the Commonwealth appears to argue, neither *Doyle* nor *Miranda* v. *Arizona*, 384 U.S. 436 (1966), is applicable. Regardless, we still consider the defendant to be exercising a right protected at least by the State Constitution. See *Commonwealth* v. *Sazama*, 339 Mass. at 157; *Commonwealth* v. *Burke*, 339 Mass. at 532. The defendant, who was clearly suspected of a crime and had good reason to be cautious about what he said to the police, expressly asserted his right to remain silent. *Commonwealth* v. *Sazama, supra* at 157-158. *Commonwealth* v. *Burke, supra* at 531-532. Such an assertion is "not competent testimony against such defendants." *Commonwealth* v. *Sazama, supra* at 158. *Commonwealth* v. *Burke, supra* at 532-533.[7]

missible. Nevertheless, even if the first statement was not separable and should have been struck along with the second, we do not believe it would change the result in the case, given the very strong evidence of guilt, including other admissible consciousness of guilt evidence.

[7]The express assertion of the right to remain silent has been analyzed

The testimony referring to the defendant's assertion of his right to remain silent was also not necessary "for the limited purpose of clarifying why a police interview ended abruptly." *Commonwealth* v. *O'Laughlin*, 446 Mass. 188, 206 (2006). See *Commonwealth* v. *Martinez*, 431 Mass. 168, 183 (2000). The first time the prosecution introduced testimony about the defendant's invocation of a right to silence, the trooper had already testified that the interview had ended. See, e.g., *Commonwealth* v. *King*, 34 Mass. App. Ct. at 469. The second reference was also unnecessary to explain the execution of the search warrant. In sum, the officer's two references to the defendant's assertion of his right to remain silent violated his constitutional rights.

2. *Effect of the improperly introduced statements at trial.* Where, as here, the defendant timely objected to the impermissible testimony regarding his exercise of the right to remain silent, we decide "whether the record establishes 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Commonwealth* v. *Peixoto*, 430 Mass. at 660, quoting from *Chapman* v. *California*, 386 U.S. 18, 24 (1967). *Commonwealth* v. *Isabelle*, 444 Mass. 416, 419 (2005). This is true regardless of whether the judge struck the improper references, as was done here. *Ibid.*

In analyzing whether the erroneous references to the defendant's exercise of his right to remain silent were harmless beyond a reasonable doubt, we look at five factors:

"(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the

somewhat differently from silence itself, at least in the context of prearrest, pre-Miranda silence. See *Commonwealth* v. *Sazama*, 339 Mass. at 157-159; *Commonwealth* v. *Burke*, 339 Mass. at 532-533; *Commonwealth* v. *Nickerson*, 386 Mass. 54, 62 (1982) ("[i]n general impeachment of a defendant with the fact of his [pre-Miranda,] pre-arrest silence should be approached with caution, and, whenever it is undertaken, it should be prefaced by a proper demonstration that it was 'natural' to expect the defendant to speak in the circumstances"); *Commonwealth* v. *Thompson*, 431 Mass. 108, 116-117, cert. denied, 531 U.S. 864 (2000). See also *Jenkins* v. *Anderson*, 447 U.S. 231 (1980) (impeachment of defendant with prearrest, pre-Miranda silence not found to violate Federal Constitution).

frequency of the reference; and (5) the availability or effect of curative instructions."

*Commonwealth* v. *Mahdi*, 388 Mass. at 696-697 (footnotes omitted). "These factors are not exclusive or exhaustive." *Id.* at 697. We proceed to analyze this case under the *Mahdi* factors, keeping in mind our standard that in addressing an error of this nature "reversal is the norm, not the exception." *Id.* at 698. *Commonwealth* v. *DePace*, 433 Mass. at 385. *Commonwealth* v. *Ewing*, 67 Mass. App. Ct. 531, 544 (2006), *S.C.*, 449 Mass. 1035 (2007).

The premise of the defense was that there was insufficient evidence to convict the defendant and an inadequate investigation of the crime. As consciousness of guilt provided some important evidence in the case, the improper references to the defendant's right to remain silent implicated the defense. This was not, however, a case where the Commonwealth's proof of consciousness of guilt relied heavily on the improper commentary on the defendant's assertion of the right to remain silent. The defendant's initial statements to the police — in which he asked if they were following him and in which he contradicted himself about where he was the night before — and, more importantly, his concealment of the sneakers, provided the most compelling evidence of consciousness of guilt. Compare *Commonwealth* v. *Isabelle*, 444 Mass. at 423-424 (Sosman, J., dissenting) ("[t]he only — or at least the clearest — consciousness of guilt evidence that came before the jury was evidence that the defendant's immediate response to being asked whether she had injured her child was a request to see her lawyer"). Cf. *Commonwealth* v. *Delaney*, 442 Mass. 604, 613 (2004) (cumulative evidence of consciousness of guilt, even if erroneous, not prejudicial where other consciousness of guilt evidence was overwhelming).

The second factor (who introduced the issue at trial) clearly supports the defendant. Over objection from the defendant, the prosecution directly elicited testimony from its witness about the defendant's invocation of his right to silence. Compare *Commonwealth* v. *Peixoto*, 430 Mass. at 661 ("although the prosecutor's question [of the defendant] was itself improper, the truly objectionable part of the exchange came from the defendant

himself"). Moreover, the prosecutor should have foreseen the testimony, as defense counsel certainly did. Contrast *Commonwealth* v. *Isabelle*, 444 Mass. at 420 ("the record [made] clear that the prosecutor did not foresee the erroneous testimony"). There is certainly no question that the second reference could have and should have been avoided.

The third factor, the quantum of evidence of guilt, goes strongly in the Commonwealth's favor. Although the evidence is purely circumstantial in the instant case, it singles out the defendant. Someone with inside knowledge of the office clearly committed the robbery. That person's knowledge of the office was also somewhat dated, as evidenced by the decisions to try to break into a side door which until recently had no deadbolt and to focus exclusively on a desk that until recently had contained cash. The defendant had worked at New Wave until a month before. Most importantly, sneaker prints that could be reasonably dated to the night of the crime matched the defendant's sneakers in make, size, and wear and tear. The prints were found on sheetrock and plywood not present when the defendant worked there. As discussed earlier, there was also ample evidence of consciousness of guilt. The circumstantial evidence of guilt here was very strong.

As to the fourth factor (frequency of the reference), we recognize the gravity of at least two improper references to the right to remain silent by a police officer, and a prosecutor who seemed unable to steer away from a problematic area of inquiry. See *Commonwealth* v. *DePace*, 433 Mass. at 385. The prosecutor did not, however, reference either statement in opening or closing or in his own questioning. Nor was the point otherwise dwelt upon or emphasized. Contrast *ibid.* (impermissible testimony "did not arise through some inadvertence. By design, a 'video presenter monitor' was used to maximize the impact on the jury of . . . the defendant's . . . request to speak with an attorney").

Finally, although no specific instruction regarding the right to remain silent was requested or given in the jury charge,[8] the judge did instruct the jury to disregard the language immediately

---

[8]In his humane practice instruction to the jury, the judge did, however, recite the Miranda warnings, including the right to remain silent.

after the impermissible testimony, and struck the first of the objectionable statements.[9] Compare *Commonwealth* v. *Isabelle*, 444 Mass. at 419-420 (judge sustained objection to testimony and struck answer; curative instruction not immediately requested or given, but when charging jury, judge instructed: "[Y]ou may not consider any answers that I struck from the record and told you to disregard. Do not consider such answers"). Contrast *Commonwealth* v. *Cobb*, 374 Mass. 514, 521 (1978) (judge refused to strike testimony regarding assertion of right to remain silent; "[t]hus, the prejudicial effects of the testimony . . . reached the jury with full force and without the potentially countervailing influence of prompt and forceful cautionary instructions"). While the defendant could have requested a stronger curative instruction, he did not, and the jury is presumed to follow instructions to disregard testimony. *Commonwealth* v. *Isabelle, supra* at 420.

Ultimately, upon review of the evidence in the entire case, we conclude that disturbing but struck references to the defendant's assertion of his right to remain silent are harmless beyond a reasonable doubt. There was very strong circumstantial evidence of the defendant's guilt and significant evidence of consciousness of guilt on the part of the defendant that did not involve his assertion of his right to remain silent. The struck statements were confined to one officer's testimony and were not echoed by the prosecutor in his questions or opening or closing. We therefore consider this one of the exceptional cases where objected-to and erroneous testimony regarding the defendant's assertion of his right to remain silent does not require reversal. See, e.g., *Commonwealth* v. *Peixoto*, 430 Mass. at 661; *Commonwealth* v. *Isabelle*, 444 Mass. at 422; *Commonwealth* v. *Aparicio*, 14 Mass. App. Ct. 993, 993-994 (1982).

3. *Restitution.* The defendant's terms of probation included an order that he pay $43,421 in restitution. At the restitution hearing, the judge stated that there were two issues to consider: "I think we need to make a determination first what the restitu-

---

[9]On the first day of trial, in his general remarks to the jury, the judge also instructed that if in the course of the trial he were to allow a motion to strike testimony from a witness, it would mean that the statement "should not have been said . . . and you are not to consider that under our rules of evidence."

tion is and then we will have to deal with the secondary issue of the ability to pay." He then added, "But let's deal with the issue of restitution first and then obviously at some point, you know, if he can't pay it then some other judge is going to have to make a determination on the ability to pay or what to do about that."

At the hearing, all the testimony focused on the amount owed, not the ability to pay. The judge did not bar any evidence on ability to pay, nor was any offered. Thereafter, the defendant filed a motion for new trial pursuant to Mass.R.Crim.P. 30(b), as appearing in 435 Mass. 1501 (2001), because the judge arrived at the amount without a consideration of the defendant's ability to pay.[10] The motion was denied because the "defendant had a full and fair opportunity to present evidence of his ability to pay at the original hearing." Furthermore, the judge wrote that "[t]his ruling in no way makes any determination about the defendant's present ability to pay and does not preclude the defendant from filing any motion to have the funds remitted due to a present inability to pay."

At a restitution hearing, "the Commonwealth bears the burden of proving the amount of the loss by a preponderance of the evidence." *Commonwealth* v. *McIntyre*, 436 Mass. 829, 834 (2002). Moreover, "[t]he defendant must have an opportunity to be heard and to cross-examine witnesses. . . . The defendant is entitled to rebut the victim's estimate of the injury with the defendant's own experts or witnesses." *Ibid.* All of those requirements were satisfied here.

Additionally, in *Commonwealth* v. *Nawn*, 394 Mass. 1, 8-9 (1985), the court stated that "in a criminal case, the judge must . . . decide the amount that the defendant is able to pay [in restitution] and how such payment is to be made." In *Commonwealth* v. *Payne*, 33 Mass. App. Ct. 553, 554 (1992), this court added, "[B]efore a judge imprisons a defendant for failure to pay a fine, the judge should inquire into the defendant's abil-

---

[10]We note that we have serious doubt as to the applicability of rule 30(b) to the defendant's challenge to the restitution amount arrived at after hearing. A motion under Mass.R.Crim.P. 30(a), as appearing in 435 Mass. 1501 (2001), would have been more appropriate. In any event, the defendant's challenge to the restitution order was consolidated with his direct appeal, and for the reasons stated below, we discern no error on the part of the judge.

ity to pay and into 'reasonable alternatives to incarceration, such as a long-term payment schedule or community service.' . . . What informs those decisions is the idea that a person in collision with the government ought not to be punished for his poverty."

In the instant case, the entire focus of the initial proceeding was the amount owed. The defendant did not even suggest an inability to pay. We therefore discern no abuse of discretion on the part of the judge in denying the rule 30(b) motion. That being said, in the event the defendant faces revocation of his probation for failure to pay the restitution, "he may raise his ability to pay at any future probation revocation hearing that should take place based on his nonpayment." *Commonwealth* v. *Morris M., ante* 688, 698 (2007).

*Judgments affirmed.*

*Order denying motion for new trial on restitution affirmed.*